# Illinois Official Reports

## Appellate Court

---

### *People v. Olaska*, 2017 IL App (2d) 150567

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL J. OLASKA, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0567 |
| Filed | December 19, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 12-CF-225; the Hon. Kathryn E. Creswell, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Douglas H. Johnson, of Kathleen T. Zellner & Associates, P.C., of Downers Grove, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Edward R. Psenicka and Lisa A. Hoffman, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Zenoff and Jorgensen concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Daniel J. Olaska, appeals his conviction of first degree murder (720 ILCS 5/9-1(a)(2) (West 2012)) arising from the stabbings of Willie Hayes and Shaun Wild in downtown Naperville in February 2012. Defendant makes nine individual contentions of error, most of which fall into the following broad areas: (1) the sufficiency of the evidence to support his murder convictions, (2) the adequacy of the jury instructions on aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2012)), which was an uncharged predicate offense for the charge of felony murder (720 ILCS 5/9-1(a)(3) (West 2012)), and (3) the propriety of the State's examination of a police officer concerning defendant's postarrest silence. For the following reasons, we affirm.

¶ 2                          I. BACKGROUND
¶ 3                          A. Introduction
¶ 4    Among the patrons at Frankie's Blue Room (Frankie's) in Naperville in the midnight hour of February 4, 2012, were defendant, Hayes, and Wild. Defendant had arrived at Frankie's with his friend, Steve Blacksmith, who had since left. Hayes and Wild knew each other from their time on the football team at North Central College (NCC). Also present at Frankie's were several other past or present members of the NCC football team, including Peter Bulandr, Will Thrun, Bradley Crackel, Jordan Tassio, Josh Sartori, Scott Skuteris, Andrew Trybula, and Paul Yuccas. Defendant had not met Hayes or Wild before that night. Shortly before 1 a.m. on February 4, defendant had a conversation with Hayes while both were seated in a booth. Trial witnesses variously described the conversation, but all agreed that it grew heated. During the verbal escalation, Wild and several other associates of Hayes's were near the booth. The encounter culminated in defendant producing a knife from his pocket and stabbing Hayes in the chest. Defendant then walked away from the booth. Wild pursued and caught up to defendant. Their encounter, too, was subject to conflicting accounts at trial. Defendant stabbed Wild in the arm and chest before being restrained by Rafael Castaneda, one of Frankie's bouncers. In his struggle with defendant, Castaneda received a knife wound to the arm. Hayes and Castaneda survived but Wild died from his chest wound.

¶ 5    In March 2012, a grand jury indicted defendant on 14 counts. Defendant went to trial on 10 counts: 2 counts of intentional murder (720 ILCS 5/9-1(a)(1) (West 2012)), 3 counts of knowing murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2012)), 2 counts of felony murder (720 ILCS 5/9-1(a)(3) (West 2012)) predicated respectively on aggravated battery (Hayes) (720 ILCS 5/12-3.05(a)(1) (West 2012)) and attempted murder (Hayes) (720 ILCS 5/8-4(a), 9-1(a) (West 2012)), 2 counts of attempted murder (Hayes and Castaneda) (720 ILCS 5/8-4(a), 9-1(a) (West 2012)), and 1 count of unlawful use of a weapon (720 ILCS 5/24-1(a)(8) (West 2012)). Prior to trial, the State dismissed four counts of armed violence (Hayes and Castaneda) (720 ILCS 5/33A-2(a) (West 2012)).

¶ 6    The defense gave notice of its intent to claim at trial that the stabbings of Hayes and Wild were in self-defense. The trial was held over several days in March 2015. The evidence consisted of over 30 witnesses, several hours of video footage from six interior security cameras at Frankie's, and audio recordings of defendant's phone conversations with family members while he was in jail awaiting trial.

¶ 7     The parties presented pointedly different theories of what motivated defendant to stab Hayes and Wild. The defense proposed as follows. Defendant was in fear not only of Hayes, who was seated in the booth across from defendant, but also of other current or former NCC football players who were standing near the booth, one of whom (Tassio) physically prevented defendant from leaving the booth at one point. Defendant stabbed Hayes defensively, only after Hayes threatened him with physical violence and lunged across the table at him. After stabbing Hayes, defendant left to avoid further danger but in the process was grabbed from behind by someone whom he thought was Hayes. Out of fear, defendant stabbed the person, who turned out to be Wild.

¶ 8     According to the State's theory, defendant grew sullen and belligerent at Frankie's after another patron, Sarah Schwenn, spurned his romantic advances. Defendant became, in the State's words, a "ticking time bomb." At one point in the evening, Schwenn danced with another man, John Reynolds. Defendant later approached Reynolds, displayed a knife to him, and uttered an apparent threat. Sometime after this, defendant approached another patron, Gina Gargaro, and verbally abused her for no apparent reason. Subsequently, when defendant was with Hayes in the booth, Hayes's teammates did not attempt to trap defendant in the booth. Defendant showed no fear of Hayes or his associates, and at no point was defendant justified in using deadly force—a stab to the chest—against Hayes. According to the State, defendant's movements after stabbing Hayes were an attempt to escape following an unjustified deadly attack, and therefore defendant was not legally justified in using deadly force to ward off Wild's attempt to apprehend him.

¶ 9     Both parties claimed support for their theories in the security footage. The State also claimed that the audio recordings of the jail phone calls showed that defendant, at the insistence of family members, fabricated his self-defense theory.

¶ 10                                    B. Testimony in the State's Case
¶ 11               1. Defendant's Interaction With Bar Patrons Before Encountering Hayes

¶ 12    Frankie's is a second-floor establishment. There are two entrances by stairs: the north (or front) entrance and the south (or rear) entrance. The interior space is arranged as follows. East of the north entrance is the stage, which is elevated two steps above the dance floor to the south. On the west end of the dance floor is a series of booths, numbered consecutively from north to south. The booths are lined up against a low wall that separates the dance floor from the bar area to the west. Defendant stabbed Hayes in one of those booths, identified at trial as booth No. 4. There are also tables in the northwest corner of the dance floor. Defendant stabbed Wild near one of those tables, and Castaneda restrained defendant in that same area. South of the dance floor is the DJ booth and the south entrance.

¶ 13    Schwenn testified that she and her friend Keli Jepson arrived at Frankie's about 10:30 p.m. on February 3, 2012. While ordering drinks, they met defendant and Blacksmith. They also met Emmanuel Valadez. Schwenn danced with Valadez. Later, while Jepson danced with Valadez, Schwenn danced with defendant. He touched her more than she preferred, running his hands up and down her waist and hips. After Schwenn and defendant danced for 5 to 10 minutes, Schwenn and Jepson went outside so that Schwenn could have a cigarette. While they were outside, defendant came out and spoke on his cell phone. They overhead him say that he was going to stay at Frankie's and find his own ride home. When Schwenn and Jepson reentered Frankie's, defendant followed them. Schwenn and Jepson left

defendant and went to the end of the bar opposite him. Schwenn was no longer interested in spending time with defendant. While at the other end of the bar, Schwenn met Reynolds and danced with him. While she was dancing, defendant approached and placed a beer in her hand. Schwenn had not asked for the beer. Defendant then went to booth No. 4 and put his coat down. Later, while Schwenn was still dancing with Reynolds, defendant approached and Reynolds walked away. After dancing with defendant for a minute or two, Schwenn stopped and stood on the dance floor. Defendant grabbed her and began dancing with her again. Schwenn thanked defendant for the beer and said that she just wanted to spend time with her friends. Defendant walked over to booth No. 4, took his coat, and walked away. According to Schwenn, this occurred shortly after midnight.

¶ 14 Schwenn stated that, soon after defendant walked away, Reynolds approached and they danced. After about 10 minutes, they went to the bar together, holding hands. Schwenn decided to smoke again outside. After retrieving her coat from booth No. 4, she went to the bar to get Jepson and saw defendant talking with Reynolds. Schwenn thought that this was unusual. When she and Jepson returned from outside, she put her coat back down in booth No. 4. She saw defendant approach and walked away. She was on the dance floor shortly before 12:30 a.m. when she saw Jepson seated in booth No. 4 with defendant. They were on the same bench, with Jepson on the inside. Schwenn got Valadez's attention and said that they needed to "rescue" Jepson. They walked over to the booth. When Valadez invited Jepson to dance, defendant would not move to let her out of the booth. Jepson had to climb over defendant to get out. Schwenn, Jepson, and Valadez then danced. They were about 5 to 10 feet from booth No. 4. Defendant sat facing them with no emotion on his face. Schwenn testified that this was "creepy at points" and made her uncomfortable. She admitted, though, that it was "nothing major."

¶ 15 Later, but still before 12:30 a.m., Schwenn's attention was again drawn to booth No. 4, where she witnessed defendant arguing with a woman over sports. They raised their voices and pointed at each other. The argument appeared genuine and not playful. Not wanting to become involved, Schwenn and Jepson went to the opposite end of the dance floor. About 10 minutes later, Schwenn decided to go outside again to smoke. She went to booth No. 4 and asked defendant if her coat was beside him. Defendant said that he did not know. When she asked if he could look, he refused. When she reached around defendant to grab her coat, he did not move at all to accommodate her. Schwenn noticed a man seated across from defendant but did not see them interact. According to Schwenn, defendant became withdrawn, frustrated, and unhelpful as the evening progressed. He seemed angry when she was retrieving her coat.

¶ 16 Schwenn stated that, after she smoked, she and Jepson decided to leave. When they exited the parking ramp, they observed police cars and ambulances outside Frankie's. They saw a person carried out on a stretcher and defendant led out by the police.

¶ 17 Jepson testified that she and Schwenn arrived at Frankie's about 10:40 p.m. on February 3. At the bar, they were introduced to defendant and Blacksmith. They also met Valadez. Schwenn danced with defendant while Jepson danced with Valadez. During a smoke break outside, Schwenn remarked to Jepson that defendant was "clingy" while they danced. Defendant also came outside and spoke on his cell phone. Blacksmith left around 11:30 p.m., and defendant decided to remain at Frankie's. When the three of them went back inside Frankie's, Jepson and Schwenn went to the end of the bar opposite defendant. Around

midnight, Jepson was on the dance floor with Valadez and Schwenn when defendant approached and placed a drink in Schwenn's hand. Schwenn was already holding a drink, and Jepson could see that she was annoyed by now having two to hold. Defendant then left the dance floor. Later, a friend of Valadez's came onto the dance floor and began dancing with Schwenn. When Jepson next looked over, Schwenn was dancing with defendant. Jepson saw Schwenn lean in and speak to defendant. After this, defendant left the dance floor. Schwenn continued to dance with Valadez's friend. Afterward, the four of them went to the bar to order drinks. A few minutes later, Schwenn and Jepson decided to go outside for another smoke break. When Schwenn and Jepson returned from outside, Schwenn placed her coat in booth No. 4. Jepson sat down in the booth and defendant, who was standing nearby, sat down next to her. Defendant asked Jepson what his "place" was regarding Schwenn. Defendant said that he liked Schwenn. Jepson told defendant that Schwenn wanted to have a good time and meet people and was not interested in forming lasting relationships. Defendant said nothing in response.

¶ 18     Jepson testified that, after her conversation with defendant, Schwenn and Valadez came over and invited her to dance. Valadez extended his hand to Jepson, and she rose to exit the booth. Defendant, who was on the outside end of the bench, did not move to let her out. Jepson had to "get over him to get onto the dance floor." Defendant said nothing and looked straight ahead. He was calm and showed no sign of intoxication. Jepson, Schwenn, and Valadez danced about 8 to 10 feet from booth No. 4. Jepson's attention was drawn back to booth No. 4 by raised voices. She saw defendant arguing with a woman. They were shouting and pointing at each other. Jepson brought it to Schwenn's and Valadez's attention, and the three of them moved farther away. Jepson saw a man step between defendant and the woman. After a time, the argument stopped. Schwenn and Jepson decided to go for another smoke break. Schwenn went to retrieve her coat from booth No. 4. Jepson could not see who was in the booth at the time. While Schwenn and Jepson were outside, they decided to leave. After they got their car, they saw ambulances and police cars in front of Frankie's. They also observed defendant being led out of Frankie's in handcuffs.

¶ 19     Reynolds testified that, on the night of February 3, he arrived in downtown Naperville in a limousine with a group that was celebrating Kristen Dewar's birthday. On the way downtown, Reynolds met Valadez, who was also with the group. While at Frankie's, Reynolds met and danced with Schwenn. As they were dancing, defendant approached and "cut in" by dancing in front of Schwenn. This occurred around 12 a.m. Reynolds had not met defendant before. Not knowing if defendant and Schwenn were together, Reynolds walked away.

¶ 20     Later on the dance floor, Reynolds asked Schwenn if defendant was her boyfriend, and she said no. The two went to the bar to get drinks. When Schwenn left to get her jacket, defendant walked up to Reynolds. Reynolds told defendant that he was sorry for dancing with Schwenn if she was defendant's girlfriend. Defendant took a knife out of his right pocket with his right hand. Holding the knife across his chest, he said to Reynolds something like "I have it covered, or, it will be taken care of." The knife had a silver blade and a black handle. Reynolds was shocked. He immediately told a woman standing next to him that defendant had shown him a knife. The woman was McKala Kruse, another member of Dewar's birthday group. Shown security video of that night, Reynolds identified when, from 12:19:11 to 12:19:19 a.m., defendant displayed the knife to him. Reynolds admitted that the

knife is not actually visible on the video, though he noted that defendant is seen holding his arm at a 90-degree angle, which was the posture Reynolds claimed defendant had when he showed the knife. Asked if he has a "giant smile" on his face later, at 12:20:35 a.m., Reynolds replied that he could not tell his facial expression from the video.

¶ 21 Reynolds testified that, after speaking to Kruse, he joined his friends in another part of Frankie's. He did not see defendant for the remainder of the night. At 12:46 a.m., Reynolds noticed a commotion on the dance floor. He saw no fighting or arguing but did observe blood on the floor. The police and paramedics arrived.

¶ 22 Reynolds did not see any sign of intoxication in defendant. Reynolds did not remember how much he himself drank that night, but he recalled that he did not have a hangover the next day.

¶ 23 Reynolds testified that he did not inform a bouncer or bartender about the knife because he "just figured [that defendant] was acting like a tough guy just defending a girl that he liked." Reynolds "did not think anything like that [(*i.e.*, the stabbings of Hayes and Wild)] was going to happen that night." Reynolds acknowledged that he told the police in a February 15, 2012, videotaped statement that the reason he did not tell a bouncer or call the police after defendant showed the knife was that he did not consider it a "big deal" at the time. Reynolds testified that he wished in retrospect that he had informed Frankie's personnel about defendant.

¶ 24 Kruse testified that she and her boyfriend were part of the group celebrating Dewar's birthday. She met Reynolds for the first time that night. Shortly before 12:20 a.m., she was in the bar area of Frankie's when Reynolds told her that a man had just threatened to stab him because he had been dancing too close to the man's girlfriend. Reynolds did not say that the man had taken out a knife. Reynolds seemed shocked and stunned. They spoke for a minute before Reynolds walked away. She did not advise Reynolds to tell a bouncer about the man because the threat seemed like the "empty" kind that people make in bars.

¶ 25 Kruse stated that, around 12:45 a.m., she noticed a disturbance. The music stopped, the lights came on, and Kruse saw people standing around. One person was lying on the floor, bleeding. Eventually, paramedics arrived.

¶ 26 Kruse admitted that, when she spoke to the police on February 12, 2012, she did not tell them of the threat that Reynolds reported to her. She explained that, at the time of the police interview, she had not made a connection between the threat and the stabbings that same night at Frankie's.

¶ 27 Valadez testified that he met Reynolds while traveling to downtown Naperville to celebrate a birthday. Around 10:40 p.m. in the bar area inside Frankie's, he met defendant and another man. Later, Schwenn and Jepson arrived. Valadez spoke with Jepson while defendant spoke with Schwenn. Valadez danced first with Schwenn and then with Jepson. Around 11:50 p.m., defendant began to dance with Schwenn while Valadez danced with Jepson. Schwenn and Jepson decided at one point to go outside to smoke. When they returned, Valadez danced with them both. Shortly before midnight, while the three were still on the dance floor, defendant approached Schwenn and put a drink in her hand. She was already holding a drink. Later, Reynolds joined Schwenn, Jepson, and Valadez on the dance floor. Defendant came and started dancing with Schwenn, and Reynolds stepped away. Defendant and Schwenn danced for a short time before they stopped and talked. Defendant

then stepped away, and Schwenn remained on the dance floor where she was rejoined by Reynolds.

¶ 28    Valadez testified that, after Jepson and Schwenn returned from another smoke break, he and Schwenn went to the dance floor while Jepson sat in booth No. 4. Defendant slid onto the bench next to her. Schwenn and Valadez then invited Jepson to dance. Valadez extended his hand to Jepson. Defendant would not move, and Jepson had to climb over him to get out.

¶ 29    Valadez stated that, later, Schwenn and Jepson decided to go outside for another smoke break. Valadez watched as Schwenn went to retrieve her jacket from booth No. 4 where defendant was still seated. Schwenn said something to defendant "and then ended up having to reach over and pull her jacket from behind him." Schwenn and Jepson left Frankie's for the night, and Valadez rejoined the birthday group.

¶ 30    Valadez testified that, around 12:46 a.m., there was a commotion near booth Nos. 1 and 2. Valadez saw Wild on his knees. Valadez walked over and saw that Wild was now on his back. Valadez saw blood, opened Wild's shirt, and applied pressure to the puncture wound in his chest. Wild was unresponsive. Paramedics arrived and took Wild out on a stretcher.

¶ 31    Gargaro testified that she came to Frankie's with her roommate, Megan Gedutis, sometime after 11 p.m. While at Frankie's, they met Thrun and Bulandr, whom they knew previously. Gargaro described them both as "big guys." Gargaro had an ongoing playful disagreement with Thrun that night about the Super Bowl. At one point in the evening, Gargaro was near booth No. 4 with Bulandr and Gedutis when defendant approached and called her a "fucking bitch." Gargaro told defendant to leave her alone and sit down. Shown the security footage, Gargaro identified herself and defendant pointing at each other. Gargaro testified that, during her interaction with defendant, Thrun came over and stepped between them with his back to defendant. Gargaro had not asked Thrun to intercede. Defendant continued to yell while Gargaro ignored him and spoke with Thrun. Defendant pointed at Gargaro over Thrun's shoulder. Gargaro came back and pointed at defendant again, telling him to sit down. Gargaro eventually left and found Gedutis and Bulandr, who were sitting in booth No. 4. Thrun also came over. After saying goodnight to Thrun and Bulandr, Gargaro and Gedutis left Frankie's. Gargaro did not ask Bulandr or Thrun to beat up defendant.

¶ 32    Bulandr testified that he was at Frankie's with fellow NCC football teammates celebrating Trybula's birthday. Bulandr estimated his height at 6 feet, 2 inches, and said that Crackel was taller. Bulandr and Thrun arrived shortly before 11 p.m. They spent most of their time on the dance floor or in the vicinity of booth No. 4. Around 12:30 a.m., Bulandr danced with a girl named Sarah. Around the same time, he and Thrun met Gargaro and Gedutis. Bulandr knew Gargaro through Thrun. As Bulandr was speaking with Gedutis, he overheard an argument between Gargaro and defendant. Bulandr paid little attention to the argument and continued to speak with Gedutis. Bulandr said nothing to defendant at that time. Bulandr was shown the security footage and identified Thrun and himself near defendant and Gargaro when they were arguing. Also in the vicinity were Tassio and Skuteris. Bulandr denied that he and his teammates decided to "take care" of defendant or discussed him at all. Bulandr noted that the security footage shows defendant and Skuteris conversing immediately after defendant's argument with Gargaro. Bulandr observed that defendant and Skuteris appear to have their arms around each other's shoulders and exchange high fives.

¶ 33    Bulandr eventually sat in booth No. 4, which was then unoccupied, and conversed with Gedutis as she stood in front of the booth. Thrun and Gargaro were standing nearby. Defendant approached and asked Bulandr to get out of the booth. Bulandr could not recall the exact words defendant used or whether the request was more like an order. Bulandr exited the booth. He made no threat to defendant. Bulandr remained in the vicinity of booth No. 4, speaking with Gedutis. After she and Gargaro left Frankie's, Bulandr returned to the dance floor, closer to booth No. 3 than booth No. 4. At some point, Hayes came over and sat in booth No. 4, where defendant was still seated. Bulandr did not bring Hayes to booth No. 4 or tell Hayes that he needed to take care of a problem in booth No. 4. Bulandr spoke with Hayes while Hayes was seated in booth No. 4, and he did not hear Hayes threaten defendant.

¶ 34    Later, Bulandr heard a commotion in the stage area and saw Wild slumped over. Bulandr's attention was then drawn back to booth No. 4, where he saw Hayes slouched in his seat and holding his chest. There was blood on Hayes's hands. Bulandr laid Hayes back on the bench and applied pressure to his chest wound. Paramedics eventually arrived.

¶ 35                    2. The Stabbings of Hayes and Wild

¶ 36    Hayes testified that he and Trybula came to Frankie's at 11 p.m. They had walked from Trybula's apartment, where they and others were celebrating Trybula's birthday. Other NCC football players and coaches were at Frankie's. Hayes testified that he drank before and during his time at Frankie's and was intoxicated when he encountered defendant in booth No. 4. Hayes testified that, in February 2012, he was 5 feet, 11 inches, tall and weighed 210 to 215 pounds.

¶ 37    Hayes stated that he spent most of his time at Frankie's on the dance floor. At one point, he went to booth No. 4 and sat across from defendant, who was already seated there. Hayes could not recall why he chose booth No. 4 in particular. He could not recall if someone spoke to him about defendant before he sat down. When Hayes sat down, he and defendant shook hands and introduced themselves. Initially, they did not have much contact. Hayes drank, watched his friends on the dance floor, and spoke to them as they came to set their drinks on the table. A blonde woman also came and reached across the table to retrieve a coat. She said something to defendant that Hayes could not recall.

¶ 38    Hayes testified that he and defendant eventually conversed, but he could not recall what they talked about. He could not recall any reference to the fit of his shirt or to what defendant was drinking out of the wine glass he was holding. The tone of the conversation became uncomfortable for Hayes, and he felt that he should leave. At one point, defendant stood and waved his arms. He seemed "very aggressive," which made Hayes uneasy. As they spoke, Hayes's friends, including Wild, were walking back and forth between booth No. 4 and the dance floor. Hayes denied that defendant was ever prevented from leaving the booth. Hayes testified that he ultimately decided to leave the booth and stood up. At the time, Wild was the only one of Hayes's friends nearby. Hayes could not recall how Wild was positioned or if he said anything to Hayes. When Hayes reached out to shake defendant's hand, Hayes "felt like [he] had been punched." Wild was standing next to Hayes when Hayes felt the punch. Hayes began having trouble breathing and put his hand on his chest. When he looked at the hand, he saw blood on it. He sat back down in booth No. 4. Bulandr came over and applied pressure to Hayes's chest wound as he lay back on the bench. Hayes's football coach also came over to

assist. Hayes felt extreme pain in his left chest below the nipple. Paramedics arrived and transported Hayes to Edward Hospital, where he had surgery.

¶ 39    Hayes was shown the roughly six minutes of security footage from Hayes's arrival at booth No. 4 to defendant's stabbing of Hayes (12:40 to 12:46 a.m.). Hayes was asked about several aspects of the footage. He noted that, after he sits in the booth, he converses with several individuals, including Bulandr. Hayes could not recall if he was talking about defendant with Bulandr and the others. Tassio (Hayes mistakenly identifies him as Skuteris) approaches and interacts with Hayes and defendant. Hayes could not recall what Tassio and defendant said to each other. Eventually, Hayes stands and, placing his hands on the table, leans toward defendant. Hayes remains standing for the next minute, until the stabbing occurs. Hayes could not recall leaning toward defendant, and he denied that he could have been threatening defendant. Hayes explained, "That's not the type of person I am." Hayes claimed that he stood up because he wanted "to relieve [him]self from the situation." Hayes could not recall what prevented him from leaving once he stood up. On the video, after Hayes stands up, defendant speaks to Crackel, who is standing nearby with Wild. As he speaks, defendant points to Hayes. Hayes could not recall what defendant said to Crackel, but he admitted that it was "possible" that defendant was trying to get Crackel to help calm Hayes down. After Crackel turns away, defendant gets his attention again. Hayes admitted that it was "possible" that defendant was attempting again to get Crackel to calm Hayes down. The footage shows Wild then stepping over to Hayes and placing his left arm on Hayes's shoulder. Hayes could not recall what Wild's intentions were at this point. Hayes's intent was to leave, but he admitted that nothing kept him from leaving at this point. Several seconds later, Hayes takes one or two steps back from the booth, and Wild, now facing Hayes, places his right arm on Hayes's left shoulder, as if to guide him away. Hayes quickly throws Wild's arm off and steps back toward the table. He then leans over toward defendant, resting his hands on the table. According to Hayes, he intended at this point to shake defendant's hand. Hayes could not recall throwing off Wild's arm and lunging at defendant. Hayes testified:

"Q. And when [Wild] put his arm on you to guide you out of the booth when you intended to leave, you knocked his arm off and you lunged at the defendant, didn't you?

A. No sir.

Q. Now you remember that you didn't do that?

A. I wouldn't lunge. That's not the type of person I am.

Q. Are you the kind of person that would knock Mr. Wild's hands off of you so you could get back at the defendant?

A. No, sir.

Q. Well, you did it, didn't you?

A. Correct."

Hayes recognized that, in the footage, defendant walks away, followed by Wild. Hayes denied that he said anything to Wild as he left.

¶ 40    Hayes was asked about his statements to the police. He did not recall talking to the police before his surgery on February 4, 2012. Consequently, he did not recall telling them on that date that he was seated at a booth at Frankie's when a person he had not met before started an

argument with him or that he wanted to get up and leave because he had a bad feeling about that person or that he told the person to stop running his mouth and talking about Hayes's friends. Hayes recalled speaking to the police at his home on February 6, 2012. He did not recall telling them on that date that one of his friends told him while he was on the dance floor at Frankie's that defendant said that his shirt was too tight, that he confronted defendant about this remark and commented to him that he was drinking beer out of a wine glass, or that he ultimately stood up to remove himself from the booth.

¶ 41    Crackel testified that, in February 2012, he and Wild were close friends. They went to Frankie's together on the night of February 3 because they heard that a group would be there celebrating Trybula's birthday. They arrived shortly after 11 p.m. and recognized several members of the NCC football team. Crackel and Wild spent time walking throughout Frankie's and mingling. Sometime after 12:30 a.m., Crackel and Wild were conversing near booth No. 4. Hayes and defendant were sitting across from each other in the booth. At one point, defendant tapped Crackel on the arm, pulled him over, and asked him a question. Defendant was pointing at Hayes. Defendant appeared calm and confident but somewhat angry. Crackel could not recall the question, but he remembered that defendant did not ask for help or say that he felt threatened by Hayes. After defendant asked the question, Crackel returned to his conversation with Wild. Crackel could hear defendant and Hayes conversing. Their voices were raised above the level of the music. Defendant said something about Hayes's shirt being too tight, and Hayes replied that defendant was drinking beer out of a wine glass. Since defendant and Hayes were getting angry with each other, Crackel and Wild drew closer to the booth and "beg[an] mediating the situation." They were trying "[n]ot necessarily" to calm Hayes down but to convince him to go elsewhere in Frankie's. Crackel admitted telling the police at Frankie's that he and Wild were attempting to calm Hayes down.

¶ 42    Crackel heard defendant and Hayes repeat their comments about Hayes's shirt and defendant's drink. Hayes stood up. Wild faced Hayes and placed his hand on his shoulder, trying to escort him away. Crackel was standing behind Wild and facing Hayes. Crackel was about two feet away from defendant and was not blocking him from exiting the booth if he wished. As Wild was placing his hand on Hayes, defendant said "fuck you" and "proceeded to reach across the table and stab [Hayes] in the chest." Crackel was not facing defendant at the time and saw the motion out of the corner of his eye. Crackel initially thought that the motion was a tap on the side or shoulder, but then he saw defendant "holding the knife that he just stabbed [Hayes] with in front of his face as he stared at [Hayes]." Defendant then slowly closed the knife. When Crackel made these observations, he was about one foot from defendant.

¶ 43    Crackel testified that, after defendant closed the knife, he left the booth and walked toward the stage area and the north entrance. Wild then passed Crackel, walking in the same direction as defendant. Sartori was in the area, but Crackel could not recall what he was doing. After Wild left, Hayes was still standing, and Crackel had him sit down in the booth. Crackel then walked toward the stage area and saw Wild on his knees holding his stomach. Crackel went to the rear entrance and began to call 911 but did not complete the call. He returned to the stage area. Wild was now standing, but Crackel saw him fall back. Crackel did not see defendant during this time. The police and paramedics arrived. Crackel told the

police what he had seen and, at their request, went to identify defendant, who was now sitting on the front stairs.

¶ 44 Sartori testified that he and his roommates went to Frankie's because of the birthday celebration for Trybula. They arrived about midnight. After spending time on the dance floor, Sartori went toward the line of booths. He was standing between booth Nos. 3 and 4 when Hayes, who was seated in booth No. 4, called him over. They spoke, but Sartori could not recall about what. Sartori saw defendant seated across from Hayes in booth No. 4. After talking to Hayes, Sartori returned to where he had been standing, between booth Nos. 3 and 4. After a time, booth No. 3 became unoccupied and Sartori sat there with his roommate, Alison Muser. Sartori's bench was contiguous to the bench on which defendant was seated and his back was to defendant. Sartori sat with his legs up on the bench, facing the dance floor. He was texting his girlfriend with his cell phone. He noticed Crackel and Wild standing next to booth No. 4. Sartori looked over at booth No. 4 when he heard Hayes and defendant raise their voices. He heard Hayes say, "[H]ey man, you're drinking beer out of a wine glass." Hayes made this remark two or three times. Sartori could not hear what defendant said. Hayes stood up, followed by defendant. Sartori then stood up and "went directly" to Hayes. At that point, Wild was in front of Sartori, facing Hayes. As Sartori approached, Wild turned and walked past him toward the stage area. Sartori had not seen defendant leave the booth area. Sartori turned toward Hayes and saw him holding his right hand to his left chest area. There was blood on his hand and chest. Hayes told Sartori to "go get that guy." Sartori did not see anything in defendant's hands when he was at booth No. 4. Sartori could not recall Wild placing his hand on Hayes's shoulder or Hayes leaning or lunging toward defendant.

¶ 45 Sartori turned and went north toward the stage. He saw Wild and defendant facing each other near the stage. One of Frankie's bouncers was immediately behind defendant. Defendant lunged at Wild, who then started going backward. The bouncer grabbed defendant and pulled or pushed him toward the stage. Defendant pushed against the bouncer. During this struggle, a knife fell to the floor at their feet. Sartori picked it up. The bouncer yelled for Sartori to hand it to him. Once the bouncer had the knife, he threw it toward the stage. Sartori then went into the bathroom and dialed 911. When he returned, he saw defendant sitting on a bench in the presence of the bouncer. Wild was on his back on the floor in front of booth No. 2. As the police arrived, the bouncer left defendant, who then started to go down the stairs to the north entrance. Defendant told a police officer that the person who stabbed Wild was leaving. The officer, accompanied by a colleague, pursued defendant down the stairs. Sartori followed and saw the officers apprehend defendant and make him sit on the stairs. Later, at the officers' request, Sartori identified defendant as the perpetrator.

¶ 46 Yuccas arrived at Frankie's about 11 or 11:30 p.m. At 12:45 a.m., while standing near booth No. 2, Yuccas heard a commotion behind him. He turned toward the dance floor and saw defendant lunging at Wild. A bouncer intervened and seized defendant. Wild fell to his knees. He tried to stand but collapsed backward. Wild was bleeding and several bar patrons approached to give him aid. After several minutes, the police and paramedics arrived.

¶ 47 Castaneda testified that he and David Atwood were working security at Frankie's. When the stabbings occurred, Castaneda was stationed near the stage and Atwood by the DJ booth. Castaneda was wearing his security T-shirt, which bore the logo of Features, Frankie's sister venue that was located on the first floor of the building. Around 12:45 a.m., Castaneda was

looking toward the bar area when the shattering of glass drew his attention to the dance floor. The glass "explod[ed] kind of high in the air." Castaneda looked over and saw defendant and Wild. Castaneda judged by their postures that defendant had just smashed a glass on Wild's upper shoulder and neck area. Castaneda did not see the actual blow, but he saw defendant's hand just above Wild's body, in apparent recoil from the blow. After calling for backup on his headset radio, Castaneda went to intervene. As he approached, he saw Wild walking away and defendant following him. Judging defendant to be the aggressor, Castaneda grabbed defendant, spun him around, and pushed him against a railing. Defendant pushed back at Castaneda and swore at him. Defendant accused Castaneda of injuring him and said that the police would arrest Castaneda when they found defendant's blood on him. While restraining defendant, Castaneda saw Wild "going down to the ground." Castaneda also heard someone yell that a knife was on the floor. Castaneda spotted the knife. Both he and defendant lunged for it. Castaneda seized it first and threw it onto a part of the stage that was not in use. Before he threw it, Castaneda noticed spots of blood on the knife. The front of defendant's shirt was also bloody, but Castaneda saw that defendant was not bleeding. Castaneda himself was bleeding from his left arm and wrist. When Atwood came over to assist, Castaneda went to the bathroom to wash off the blood and make a compress out of paper towels. When Castaneda exited the bathroom, he saw defendant seated on a bench near the steps to the stage.

¶ 48 Castaneda testified that he was taken by ambulance to Edward Hospital, where he noticed three holes in the front of his security T-shirt. The holes were not there before he seized defendant that night. There were no marks on the thermal shirt that Castaneda wore under his security T-shirt. Castaneda stated that he did not see defendant holding a knife that night. He also did not see defendant stab, punch, or kick Wild.

¶ 49 Atwood testified that, around 12:46 a.m., while he was watching the dance floor from his station near the DJ booth, Castaneda radioed that there was a problem and that he needed help. Atwood looked in Castaneda's direction and saw him "hand fighting" with defendant and trying to get control of him. Defendant's hands were visible, and Atwood could see that he was holding something. When Atwood crossed the dance floor, he saw Castaneda holding defendant against a railing. Defendant was "covered in blood." Atwood asked what happened, and defendant replied, "he stabbed me." Atwood could see no injuries on defendant and asked where he was stabbed. Atwood could not recall defendant's reply. Castaneda, who was bleeding, went to the bathroom to treat himself. Defendant tried to walk away but Atwood made him sit on a bench near the steps to the stage. Atwood stood facing defendant. At one point, Atwood's attention was diverted to the area where Wild had fallen. During that momentary span, defendant attempted to head down the stairs to the front door. Defendant was not running but was "moving pretty quick." Atwood followed and saw that two police officers were already with defendant on the landing of the stairs. Atwood told the officers that defendant had stabbed someone.

¶ 50 Samantha Doti testified that she and her boyfriend came to Frankie's about 12:30 a.m. After about 15 minutes in the bar area, Doti walked to the dance floor to see friends. As she approached booth No. 1, she saw Wild, who was her friend. Wild was walking toward the stage area behind defendant. Wild was reaching toward defendant. Before Wild made contact with defendant, defendant "quickly turned and pounced at [Wild]." After shaking Wild several times, defendant walked toward the stage area, where he was grabbed by another

- 12 -

man. Doti did not see defendant after this. Doti looked toward Wild, who was hunched over. He fell to his knees. He was helped to his feet but then fell straight back. She saw blood and knew that Wild was injured. Doti also saw Hayes lying injured in booth No. 4. Paramedics eventually arrived.

¶ 51 Jason Farrell (Jason) testified that he came to Frankie's about 11:40 p.m. He was meeting two friends who were there for a birthday party. Around 12:46 a.m., he was on the dance floor facing east when he heard "elevated noise" and "was pushed on [his] back from the area around Booth 2." The force pushed him a step forward. Jason looked over his shoulder and saw defendant and Wild "in grasp with each other." Defendant's left hand was grasping Wild's right wrist. With his right hand, defendant was thrusting upward toward Wild's right arm. A bouncer pulled defendant away. Wild held his right arm and said to defendant, "Man, you cut me." Defendant had blood on the front of his shirt but appeared calm and collected. Defendant claimed that he had been cut, but the bouncer replied that defendant was the one who cut Wild. The bouncer was holding a knife.

¶ 52 Naperville police officer Teresa Stock testified that she was dispatched to Frankie's and arrived there about 12:50 a.m. Officer Kevin Fasana arrived about the same time. Both entered Frankie's through the north entrance. Upon arriving, they were approached by Atwood and Sartori, who told them that the offender was trying to leave. They pointed to defendant, who Stock saw was moving quickly toward the stairs down to the north entrance. Stock and Fasana pursued. Defendant ignored Fasana's commands to stop and continued down the stairs. Fasana and Stock caught up to defendant on the stairs and handcuffed him. Stock saw that the front of defendant's shirt was bloody. Stock found Sartori and brought him to defendant for a show-up identification. Sartori identified defendant as the perpetrator.

¶ 53 Fasana testified similarly to Stock as to defendant's apprehension at Frankie's. After arresting defendant, Fasana drove him to the police station and booked him. In the following exchange, the State asked Fasana whether defendant asked particular questions while in Fasana's presence:

"Q. [F]rom the time you were at Frankie's when you first encountered the defendant on the stairs until the point [(at the police station)] he was issued [a] jumpsuit and his clothing was removed, did he ask you why he was being detained or arrested?

A. No, he did not.

Q. At any point during your contact with the defendant, did he ask you about the condition of Shaun Wild?

A. No, he did not.

MR. DI BENEDETTO [defense attorney]: Objection.

THE COURT: What is your objection?

MR. KENDALL [defense attorney]: That he didn't even know who Shaun Wild was at that point, fact not in evidence.

THE COURT: Overruled.

THE WITNESS: No.

MR. DEMOPOLOUS [Assistant State's Attorney]: Did he ask you about the condition of Rafael Castaneda?

A. No, he did not.

Q. Did he ask you about anybody's condition?

A. No, he did not."

At that point, defense counsel requested a sidebar and, outside the jury's presence, objected that the State's questions impinged on defendant's right to remain silent. After a recess, the trial court agreed with defense counsel that the questions were improper. The court offered to admonish the jury not to consider defendant's silence as commented on by Fasana. Defense counsel accepted the offer of an admonishment but, to preserve the issue for appeal, moved for a mistrial. The court denied the motion, finding that an admonishment would be adequate. The court then instructed the jury as follows:

"Ladies and gentlemen, right before the break, there were four questions that were put to the witness. As to each of those four questions, the objection that was made will be sustained. So you are instructed to disregard each of those questions and disregard the answers that were given.

The defendant was under no obligation to make any inquiry at all, and the fact that he did not make any inquiry of the officer cannot be used against him."

After the instruction, Fasana finished his testimony.

¶ 54    Naperville police detective Richard Arsenault testified that the knife recovered from the stage area of Frankie's was a SOG Flash II folding knife with a 3½-inch blade. The knife was designed for fluid one-handed opening and closing.

¶ 55    During Arsenault's testimony, the parties stipulated that defendant's blood alcohol concentration was 0.107 at 7:02 a.m. on February 4, 2012. The parties also stipulated to the admission of the following text messages sent from or received by defendant's cell phone on February 3, 2012: (1) outgoing: "Go home, Bro. I am good. Don't worry about it"; (2) incoming: "Are you closing Sarah?"; and (3) outgoing: "Trying." The last message was sent at 11:39:56 p.m.

¶ 56    Dr. David Piazza, a surgeon, testified that he treated Wild at Edwards Hospital after emergency personnel had tended to him. Wild had a stab wound to the left chest area that pierced through the left ventricle of his heart. His heart was not beating but fibrillating. Despite Piazza's efforts, Wild died. Piazza also testified that Hayes suffered a stab wound below his left nipple. According to Piazza, the knife passed between Hayes's heart and diaphragm without damaging either structure. Piazza successfully stitched up the wound and Hayes was released after a brief hospital stay.

¶ 57    Dr. Mitra Kalelkar, a forensic pathologist, testified that she performed the autopsy on Wild. She found three stab wounds: two wounds to his right forearm and one wound to his left chest area that entirely perforated both his heart and his lung. In Kalelkar's opinion, the stab wound to the chest immediately killed Wild.

¶ 58    After the State rested, the defense moved for a directed verdict on the two attempted-murder counts (VIII and IX) and the two felony-murder counts (VI and VII). The trial court denied the motion.

¶ 59                              C. Testimony in Defendant's Case

¶ 60    Skuteris testified that he was part of the group celebrating Trybula's birthday at Frankie's. He was at Frankie's when the stabbings occurred, but he did not witness the

incidents. He identified himself on the security footage as conversing with defendant shortly after his argument with Gargaro.

¶ 61   Thrun testified regarding his and Gargaro's contact with defendant. Thrun had known Gargaro for about 10 months and the two had dated. Thrun witnessed Gargaro arguing with defendant. He could not recall what the argument was about. He stepped between defendant and Gargaro in order to separate them. The incident lasted only a couple of minutes. Defendant did not touch or speak to Thrun during the incident. Thrun did not believe that it was necessary to call security about defendant.

¶ 62   Thrun testified that he was still at Frankie's when the stabbings occurred but that he did not witness them.

¶ 63   Christina Lynn Farrell (Christina) testified that she came to Frankie's with her husband about 11:30 p.m. They were in downtown Naperville celebrating her friend's cousin's birthday. Around 12:45 a.m., she and her husband were on the dance floor when he pointed to an altercation taking place in front of them. She looked and saw defendant and Wild pushing each other. Defendant "punched" Wild in the chest, and Wild went backward into the crowd. A bouncer then grabbed defendant and moved him away. At that point, Christina saw a knife in defendant's hand. The knife fell as the bouncer was moving defendant. Christina did not see the knife before the bouncer grabbed defendant. Elsewhere in her testimony, Christina stated that she observed defendant "stab" Wild.

¶ 64   Arsenault, called again by the defense, testified that he interviewed Hayes on February 6, 2012. Hayes stated that he had had no confrontation with defendant until Hayes sat in booth No. 4. Arsenault asked Hayes how he came to sit in booth No. 4. Hayes said that he was on the dance floor at 12:30 a.m. when a friend told him that a man in booth No. 4 was making fun of how tight Hayes's shirt was. Hayes was unsure which friend told him this.

¶ 65   Naperville police officer Peter Spizzirri testified that he interviewed and took written statements from Crackel and Sartori at Frankie's. Crackel wrote the following in his statement: (1) "Hayes was sitting in a booth across from this other guy who we did not know," (2) "[Hayes] and this other guy were exchanging words, and it was apparent that they were not getting along," and (3) "Myself and Shaun attempted to calm our friend [Hayes] down as they continued to exchange words."

¶ 66   Spizzirri testified that Sartori stated in his interview that he was seated in booth No. 3 while defendant and Hayes were seated across from each other in booth No. 4. Sartori could hear Hayes but not defendant. At one point, both men stood up and Hayes stated, "[H]e's an asshole drinking beer out of a wine glass." Hayes's statement was directed at defendant. After Sartori noticed blood on Hayes's shirt, "[Hayes] told [Sartori] *** to follow defendant." Sartori stated that he saw "[Wild] grab [defendant] in the center area of the dance floor [and] spin [defendant] around." Sartori said that defendant "lunged at [Wild]," which, Sartori believed, was when defendant stabbed Wild.

¶ 67   Robert Carden, defendant's pastor, testified to defendant's involvement in Carden's church and to defendant's reputation for kindness, peacefulness, and gentleness. Cheri Lynn Gossage, a friend of defendant's family, testified to defendant's good reputation and to his helpfulness toward her family.

¶ 68   Defendant testified that he has a bachelor's degree in history and a master's degree in aerospace administration. In February 2012, he was the ground service manager for

Northwest Fliers, which operated out of Schaumburg Airport. Defendant carried a knife at work for such tasks as cutting rope and opening boxes. The knife was his own, not issued by his employer. On February 3, 2012, defendant worked his usual shift, 6:30 a.m. to 2:30 p.m. When he arrived home, he showered and changed his clothes. He placed the knife, which he had brought home, in his pocket. He made plans for later that night to see a movie with Blacksmith and Blacksmith's wife Laura. While at home, defendant had a glass or two of wine. He then visited his grandparents' home and there also had a glass of wine. Laura was not feeling well, so Blacksmith picked up defendant and they drove to downtown Naperville. They arrived at Frankie's about 9 p.m. and were the only patrons at that time. This was defendant's first visit to a bar since New Year's Day. Defendant began drinking red wine. He met Schwenn and Jepson. Defendant conversed and danced with Schwenn. He accompanied her and Jepson outside for a smoke break. Later, while they were dancing, Schwenn told defendant that he was nice but that she just wanted to dance with her friends. Schwenn was polite in saying this, and defendant was not upset by it. Subsequently, defendant went to the bar to find Schwenn and Jepson. Defendant spoke with Jepson briefly before he felt a tap on his shoulder. He turned and Reynolds made a remark to him about dancing with defendant's girlfriend. Defendant replied that he did not have a girlfriend. Defendant did not display his knife to Reynolds. Defendant testified that, by midnight, he had drunk 10 to 12 glasses of red wine and was intoxicated.

¶ 69        Defendant testified that, at some point in the evening, he and Gargaro yelled at each other on the dance floor. Defendant could not recall what they argued about, but he remembered that she yelled at him first. Defendant was angry and might have called Gargaro a "fucking bitch" once or twice. He did not remember calling her a whore. During the argument, Thrun, a "big guy," approached them but said nothing threatening to defendant. After the argument ended, defendant became friendly with Thrun.

¶ 70        Defendant testified that, after spending time at the bar and on the dance floor, he sat in booth No. 4. Jepson was already there, and he asked her if he had any chance with Schwenn. Jepson replied that Schwenn was not interested in a relationship. At some point, Valadez came to the booth and invited Jepson to dance. Jepson reached out her arm and Valadez pulled her out in front of defendant. Defendant remained in the booth. Schwenn eventually retrieved her jacket from the booth. Defendant did not recall looking for her jacket when she came to the booth. Defendant denied that he was jealous that night regarding Schwenn.

¶ 71        Defendant testified that, after Schwenn retrieved her coat from booth No. 4, he remained in the booth alone. At one point he looked toward the bar and stood up to get a server's attention. When he sat back down, there were two men across from him. One, Hayes, was seated and the other, Tassio, who was wearing white, was standing and talking to Hayes. Defendant shook hands with Hayes and noticed that his handshake was strong. Hayes was also "obviously drunk." As they spoke, Hayes became accusative, saying that defendant had "fucked with our friend." Defendant surmised that Hayes was speaking about defendant's argument with Gargaro. Defendant tried to explain his perspective, but in time, he and Hayes began yelling at each other. Defendant asked Tassio what was going on. At that point, defendant was "turned towards getting out of the booth." Tassio told defendant to sit down and "stiff-armed" him in the face. Defendant testified that "[t]his was pretty much when [he] became scared and when [Hayes] became more threatening." Defendant did not recall saying anything about Hayes's shirt.

¶ 72        Defendant testified that Hayes eventually stood up and said that he was "going to beat the fucking shit" out of defendant. Defendant said "fuck you or something" in response. There were men in the vicinity with whom Hayes was talking. Defendant had spoken to some of these men after his argument with Gargaro. Defendant now asked these men for help, saying that Hayes was "crazy" and was threatening to hurt defendant. These men "settled [Hayes] down for a bit." Hayes sat down, and the two continued to argue. After about a minute, Hayes "popped back up" and leaned forward aggressively toward defendant, saying "let's go, let's go." Defendant was frightened because Hayes was "huge." Defendant again asked the men nearby for help, and they told Hayes to "cool down" and suggested that he leave. One of them placed his arm around Hayes. Hayes said that he was "going to fuck that asshole up." Defendant said "fuck you." At this, Hayes threw the other man's arm off and "lunged" at defendant. Believing that Hayes was coming at him and would "hurt [him] bad," defendant "reached for his knife, and *** punched out at" Hayes. Defendant was "trying to get him away and get away." His action was a "reaction."

¶ 73        Defendant testified that, after stabbing Hayes, he walked toward the stage area. He had closed the knife and was carrying it in his hand or pocket. He took 5 to 10 steps before he was grabbed from behind by an arm across his throat and shoulder. The arm jerked him backward. He panicked, thinking that it was Hayes. Defendant pulled at the arm. When he was unable to free himself that way, he poked at the arm with his knife. Defendant then spun around and "punched and jerked with [his] knife" at Wild, who actually had grabbed defendant. Defendant was pushed from behind and fell forward on top of Wild. Castaneda then grabbed defendant from behind. Defendant was still in a panic; he thought that he was being attacked again. Castaneda turned defendant around and pushed him back against a railing. Defendant told Castaneda that his neck was hurt and that he was going to call the police. When Castaneda identified himself as a bouncer, defendant decided not to fight him. Defendant denied that he stabbed Castaneda.

¶ 74        Defendant testified that Castaneda held him against the railing for a time before sitting him on a bench near the steps to the stage. Onlookers were yelling. Defendant was disoriented and "not thinking." He noticed blood on his chest and arm. When the police arrived through the north entrance, near the bench where defendant was seated, he did not tell them that he had been threatened and physically assaulted in booth No. 4. He was "out of it, so [he] just started walking towards the stairs." Defendant denied that he was attempting to escape. He was "dazed" and "wasn't thinking." The police apprehended defendant on the stairs. He told them that he was injured and scared. He did not recall telling the officers that a group of Mexicans were mad at him for dancing with a girl and told him that he "messed with a chino."

¶ 75        Defendant was shown the security footage of the incident with Hayes in booth No. 4. Defendant identified the point, at 12:44:16 a.m., when, he claimed, Tassio "stiff-armed" him. He also claimed that his gesture at 12:44:39 a.m., when he spread his arms wide, was his indignant response to Tassio's action. Defendant was asking Hayes, "[W]hat the heck was that, a guy just hit me?" Defendant acknowledged that the video shows him taking a drink of beer from his wine glass just before he stabs Hayes, at 12:46:19 a.m. The video also shows him holding the knife up next to his face, at 12:46:22 a.m., before walking away. Defendant explained that he was closing the knife at that point.

¶ 76    During its cross-examination of defendant, the State introduced audio recordings of five phone calls between defendant and his family members while he was in jail awaiting trial. In a call on December 20, 2014, defendant's father asked defendant if he remembered anything about the night at Frankie's. Defendant replied that the last thing he remembered was sitting with Blacksmith. Defendant stated that he recalled "bits and pieces" of that night but did not want to discuss them in a recorded phone call. His father then commented that perhaps defendant's memory would be helped by his viewing the security video. Defendant agreed but noted that he currently remembered "basically nothing" of that night.

¶ 77    Defendant testified that he did not tell his father the whole truth in the December 20 phone call.

¶ 78    In a call on December 21, 2014, defendant's father asked if defendant recalled a woman yelling and pointing in his face on the dance floor. Defendant replied that he did not remember the incident.

¶ 79    Over the phone on January 30, 2015, defendant's father told him to call Andrew, his brother-in-law, the next day because there were a "couple family secrets" that Andrew wanted to talk about.

¶ 80    On January 31, 2015, Andrew told defendant that he was working on a story and wanted to see what defendant thought of it. Andrew read his story, which was about "Nick," a businessman who was sitting in a booth in a Ukrainian bar when two Ukrainian soldiers approached. One sat across from him while the other, wearing a white shirt, stood nearby. The seated soldier was "huge." The two soldiers began to accuse Nick of something. Nick could not understand the accusation because he did not speak Russian. Other soldiers came and surrounded Nick. Someone sat down behind him. The soldier across from him stood and began yelling down at him, trying to instigate a fight. Nick became frightened. He tapped one of the soldiers nearby on the arm. That soldier "shrugged it off" but moved closer to the booth, and Nick realized that he was blocked in. One soldier stepped in and placed his hand on the soldier who was standing across from Nick, but that soldier threw the hand off. Nick knew at that point that he had to get away, so he decided to defend himself. He "hit" the soldier across from him, pushed his way out of the booth, and headed to the stairs, "begging God" to get him out "before anything happened." The last thing Nick remembered was a glass flying by him and shattering. Nick did not know if the glass hit him or someone else.

¶ 81    Andrew stopped reading at this point and asked defendant what he thought of the story so far. Defendant said that it was "pretty good."

¶ 82    In another call on January 31, 2015, defendant's father said that defendant should study the security footage and attempt to remember what he could about that night. He added that, if needed, defendant should "manufacture" memories.

¶ 83    Defendant testified that the account he gave at trial of the night at Frankie's was his own independent recollection. Defendant denied that anybody "told [him] to say that [he was] acting in self-defense."

¶ 84    On redirect, defendant testified that he gave a statement to the police at noon on February 4, 2012. The statement, which was introduced into evidence, read:

    "Steve and I got to the bar around 9 p.m. We were the only people there at first. I drank several glasses of red wine, at least 4 or 5 or more. More people began showing up to the bar. I started talking to a girl named Sarah. I think she was there with a

friend. I can't remember the friend's name. We continued to drink and then started dancing. We danced for awhile, periodically stopping briefly to drink. After dancing, I sat at the booth and kept drinking. A guy sat across from me. We talked for a while, friendly at first; but we both got agitated. The argument escalated. His friends held him back and made him sit down when he stood up and threatened me. We argued a little more, then he got up again. I thought he was going to come at me. His friend restrained him again. I got up and lunged at him. I had grabbed my pocket knife and stabbed him. I then tried to leave. His friend grabbed me, spun me around, and I was scared and jerked again and stabbed him. Then a bouncer grabbed me and knocked the knife out of my hand. I sat for a while, then tried to leave. The police handcuffed me on the stairs. Then they took me in."

Defendant testified that, in the hours immediately following his arrest, he told the police that he did not remember what happened at Frankie's. Defendant was still drunk and "foggy" hours after the incident. After the police showed him the security video, he told them that he was beginning to remember the incident. Subsequently, he gave his written statement.

¶ 85 In its rebuttal case, the State called Fasana again. He testified that, while he was with defendant on the stairs at Frankie's, defendant stated that a group of Mexicans were angry at him for dancing with their girl.

¶ 86 D. Security Footage

¶ 87 The State introduced footage from six security cameras at Frankie's, running from 9 p.m. on February 3, 2012, to 1 a.m. on February 4, 2012. The State also introduced multiple still shots from the footage. During their examinations, most of the witnesses were shown portions of the video and related stills, and they relayed how their accounts of the night's events correlated to them. The footage is black-and-white and of poor resolution. The action is choppy because the cameras recorded at relatively few frames per second. For these reasons, it is sometimes difficult to identify individuals and track their movements, particularly at greater distances from the cameras. As a conservative measure to avoid mischaracterization of the footage, we take into account only those portions of the footage that were discussed during the witnesses' testimony and on which the parties appear to agree as to the identities of the persons depicted, even if they disagree over the proper characterizations of their actions.

¶ 88 The footage shows defendant and Blacksmith arriving together at Frankie's at 9:08 p.m. Schwenn and Jepson arrive at 10:40 p.m. Later, Schwenn and Reynolds dance together on the dance floor. At one point, when Schwenn's back is to Reynolds, defendant approaches and begins dancing in front of Schwenn. Reynolds turns and walks away. (This is when, according to Reynolds, defendant "cut in" (12:01:00 to 12:01:05 a.m.).) Defendant dances with Schwenn for a short time, placing his hands on her buttocks, before they stop, and she steps away toward Jepson (12:01:06 to 12:02:00 a.m.). Defendant walks after her and places his arms around her. They dance intermittently for several minutes before they stop and converse. Schwenn turns away and defendant walks toward booth No. 4 (12:02:23 to 12:06:38 a.m.). (This is the point when, according to Schwenn, she told defendant that she just wanted to spend time with her friends.) Several minutes later, Reynolds is sitting at the bar near Valadez and Schwenn when defendant approaches. Defendant speaks briefly with them before turning to Reynolds. The two lean in and speak to

each other. While they talk, defendant lifts his right hand to his chest. (This is when, according to Reynolds, defendant displayed the knife, but no object is visible in defendant's right hand on the video.) As defendant walks away, Reynolds watches him and then takes a drink from his bottle (12:19:11 to 12:19:22 a.m.). Kruse then approaches and speaks with Reynolds, beginning at 12:19:32 a.m. (At this point, according to Reynolds and Kruse, Reynolds informed her about defendant's threat.)

¶ 89    Subsequently, Jepson sits in booth No. 4, she slides over on the bench, and defendant sits down beside her. They speak for several minutes (12:24:58 to 12:28:35 a.m.). (Jepson testified that, during their conversation, she told defendant in essence that Schwenn was not interested in him.) Schwenn and Valadez walk over and Valadez holds out his hand to Jepson. She takes his hand and stands up. Defendant remains seated while Jepson scoots in front of him, pushing the table forward as she exits the booth (12:28:36 to 12:28:44 a.m.).

¶ 90    After Jepson leaves, defendant sits alone in booth No. 4 for the next several minutes. He looks mostly out onto the dance floor. At 12:34:54 a.m., defendant stands and approaches Gargaro, who is standing near booth No. 4, behind Gedutis and Bulandr. He places his hand on her shoulder to get her attention. She turns and points at him and then turns away. Defendant keeps addressing her, and she turns back several times to face him. Eventually, they begin pointing at each other (12:35:00 to 12:35:58 a.m.). Thrun steps over and places himself between them, facing Gargaro (12:36:00 a.m.). Thrun steps away and defendant places his hand on Thrun's back (12:37:07 a.m.). Defendant and Gargaro appear to interact again briefly before she walks over to booth No. 4, where Bulandr and Gedutis are seated (12:36:22 to 12:36:47 a.m.). Skuteris, who is standing nearby, walks over and places his arm on defendant's back. Defendant places his hand on Skuteris's back. As they talk, they high-five each other. Afterward, defendant walks back to booth No. 4 and appears to speak with Bulandr. Bulandr vacates the booth, and defendant sits down (12:36:50 to 12:38:26 a.m.).

¶ 91    Defendant is alone again in booth No. 4. At one point, he stands and looks over at the bar area. He is still standing at 12:39:24 a.m., when Hayes walks over to the booth with Tassio. Hayes sits across from defendant. Hayes's attention is initially on Tassio as they interact for a short time before Tassio steps away onto the dance floor (12:39:24 to 12:40:07 a.m.). Defendant and Hayes shake hands and converse (12:40:15 to 12:40:33 a.m.). Hayes's attention is drawn away by several people, including Bulandr, who approach and speak with him (12:40:34 to 12:41:31 a.m.). Schwenn walks to booth No. 4 and speaks with defendant before reaching behind him to get a jacket from the bench (12:41:44 to 12:42:06 a.m.). (This is when, according to Schwenn, defendant refused to look for her jacket.) Meanwhile, Sartori stands between booth No. 3 and booth No. 4 before moving closer to booth No. 4. He mostly faces the dance floor. Sartori briefly speaks with Hayes before walking back toward booth No. 3 (12:42:16 to 12:42:38 a.m.).

¶ 92    Defendant and Hayes have what appears to be an intense discussion. Defendant leans toward Hayes and gestures dramatically with his arms and hands, pointing several times to his own chest. Hayes remains relatively still, his arms folded on the table. In one instance, defendant stands up and, continuing to gesture, leans over the table at Hayes, who remains seated (12:43:58 to 12:44:03 a.m.). As defendant sits down, Tassio returns. He speaks with Hayes and places him in a playful headlock (12:44:28 a.m.). Tassio also speaks with defendant. During their interaction, defendant raises his right hand toward Tassio in what

appears to be an offered fist bump or high five. Though his back is to the security camera at the time, Tassio appears to reciprocate (12:44:12 to 12:44:16 a.m.). (Defendant testified that what Tassio did was stiff-arm him.) When Tassio leaves, defendant spreads his arms wide (12:44:39 a.m.). (Defendant testified that this gesture was his angry response to Tassio's affront.) Defendant and Hayes continue to converse, with defendant gesturing with his hands as Hayes remains relatively still. Meanwhile, booth No. 3 becomes vacant, and Sartori sits on the bench closer to booth No. 4 (12:45:16 a.m.). His back is to the bar area and his eyes are mostly on what is occurring in booth No. 4. Meanwhile, Crackel and Wild are conversing on the dance floor, near booth No. 4.

¶ 93     Hayes stands at 12:45:15 a.m. and rests his hands on the table. Defendant gets Crackel's attention and points at Hayes. Crackel steps over and leans in to hear defendant. Crackel then reaches toward the table for an indiscernible purpose (12:45:19 to 12:45:26 a.m.). Crackel steps back to where he was standing with Wild, but now both of them are looking at the booth as defendant continues to speak to them and point at Hayes, who is still standing. Wild, who is facing north toward the stage, places his left hand on Hayes's shoulder. Wild removes his hand as Hayes, still facing defendant, begins to back away from the booth (12:45:51 to 12:46:06 a.m.). As Hayes takes another step back, Wild turns to face Hayes and places his right arm on Hayes's left shoulder (12:46:09 a.m.). Hayes throws off Wild's arm and moves back toward the booth. With his hands on the table, he leans toward defendant (12:46:12 to 12:46:16 a.m.). Wild moves with Hayes to keep his shoulder between Hayes and defendant; Wild also has his arm across the front of Hayes's torso (12:46:17 a.m.). Defendant, who has been sitting since Tassio's last appearance, now stands. His right arm is at his side. In his left hand is a glass, which he has been holding in that hand for much of the time that Hayes has been in the booth. Defendant takes a drink with his left hand just before raising his right arm and punching toward Hayes's chest (12:46:19 a.m.). Hayes steps back, with Wild's arm on his shoulder. Defendant exits the booth and pauses, facing Hayes. At this point defendant is partly behind Crackel, who is behind Wild. Defendant's right hand is raised to shoulder level (12:46:22 a.m.).

¶ 94     Defendant turns and walks north along the row of booths (12:46:26 a.m.). Seconds later, Wild turns and also walks north (12:46:30 a.m.). Wild passes Sartori, who had exited booth No. 3 immediately after defendant stabbed Hayes and is now walking toward Hayes. After reaching Hayes, Sartori turns and runs north (12:46:37 a.m.). Defendant, Wild, and Sartori have disappeared into the crowd. The stabbing of Wild is not visible. Castaneda can be seen restraining defendant (12:46:57 a.m.). The crowd parts at one point, revealing Wild on his knees (12:47:08 a.m.). He stands for only seconds before falling backward (12:47:42 to 12:47:49 a.m.). Meanwhile, Bulandr and others tend to Hayes (12:48:04 a.m.).

¶ 95     At 12:51:06 a.m., Fasana and Stock arrive through the north entrance. Seconds later, defendant starts down the north stairs, where he is apprehended, at 12:51:22 a.m.


¶ 96                              E. Jury Instructions and Verdict

¶ 97     Defendant claimed at trial that the stabbings of Hayes and Wild were in self-defense. At the jury instruction conference, the State proposed instructions that predicated the felony-murder charges (Wild) on the offenses of attempted murder (Hayes) and aggravated battery (Hayes). The State had charged defendant with attempted murder but not aggravated battery. For the attempted-murder charge, the State proposed both the definitional and issues

- 21 -

instructions. The definitional instruction was drawn from Illinois Pattern Jury Instructions, Criminal, No. 6.05X (4th ed. 2000) (hereinafter IPI Criminal 4th No. 6.05X) and the issues instruction from IPI Criminal 4th No. 6.07X. The user's guide to IPI Criminal 4th describes the differences between definitional and issues instructions:

> "Most definitional instructions define the offense according to the statute. Definitional instructions are written in the present tense and the active voice. They are also written in general terms and do not mention the defendant on trial.
>
> Issues instructions separate each offense into elements, termed 'propositions,' and then list each proposition the jury must find the State to have proved beyond a reasonable doubt in order to convict the defendant. Issues instructions are written in the past tense and apply specifically to the defendant on trial." IPI Criminal 4th, User's Guide, at vii.

¶ 98 As given to the jury, the definitional instruction for attempted murder read:

> "A person commits the offense of attempt first degree murder when he, without lawful justification and with the intent to kill an individual, does any act which constitutes a substantial step toward the killing of an individual.
>
> The killing attempted need not have been accomplished."

¶ 99 The issues instruction as given to the jury read:

> "To sustain the charge of attempt first degree murder, the State must prove the following propositions:
>
> *First Proposition*: That the defendant performed an act which constituted a substantial step toward the killing of an individual; and
>
> *Second Proposition*: That the defendant did so with the intent to kill an individual; and
>
> *Third Proposition*: That the defendant was not justified in using the force which he used.
>
> If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 100 The issues instruction for intentional and knowing murder (based on IPI Criminal 4th No. 7.01) likewise contained the proposition that the defendant was not justified in using the force that he used.

¶ 101 By contrast, for the uncharged offense of aggravated battery, the State proposed *only* the definitional instruction (IPI Criminal 4th No. 11.13), which, as given to the jury, read:

> "A person commits the offense of aggravated battery when he knowingly without legal justification and by any means causes great bodily harm to another person."

¶ 102 Defense counsel expressed concern that, with respect to the aggravated battery, the jury would not be instructed that the State had to prove specifically that defendant's use of force was not justified:

"MR. DI BENEDETTO [defense counsel]: *** If there was a charge of aggravated battery, *** if the jury was getting a verdict form on the aggravated battery against Willie Hayes, I believe they would be entitled to a use of force proposition.

So, the fact that it's not charged—in other words, if the jury determines that the defendant did—had used justifiable force in committing the aggravated battery on Willie Hayes, then he wouldn't be committing the Type B felony murder. He wouldn't have committed it.

That's the problem. *** We have an attempt murder that has the justified use of force language in it.

MR. MURRAY [Assistant State's Attorney]: This [(the definitional instruction for aggravated battery)] does too.

THE COURT: It says without legal justification.

MR. DI BENEDETTO: Right. But they don't know what that means, in terms of the—there is no issue proposition. The State has to prove that the force used was not justified.

It just merely says without legal justification which every charge of aggravated battery says. It's just a charge. And without that self-defense language that's in the issues instructions for attempt murder—and by definition, it's in the definition instructions of attempt murder—we are in a position where the defendant could be—have a justifiable use of force against Willie Hayes on the aggravated battery, and the jury can't use that in this instruction. And if they were and they found that, there would not be a felony murder. That's the problem."

The trial court asked the defense to prepare a proposed additional instruction for aggravated battery.

¶ 103    A short time later in the conference, defense counsel suggested that the definitional instruction for aggravated battery could be modified to include "use of force" language. This exchange followed:

"THE COURT: *** Why wouldn't you use the IPI issues [(instruction)] [(IPI Criminal 4th No. 11.14)] on aggravated battery?

MR. KENDALL [defense counsel]: Well, because it doesn't get a verdict form for them. That's the only problem.

THE COURT: Okay. But if what you are asking for is what the issues are, you'd leave off those last two paragraphs that say, you know if you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you find the defendant guilty and then, the not guilty paragraph, you leave those off.

I mean, if I understand [defense counsel's] argument, it's that they ought to know exactly what the issues are for aggravated battery, including that it has to be not justified.

MR. MURRAY: And Judge, I would renew my argument that [the definitional instruction for aggravated battery] complies with the requirements for Type A [(intentional or knowing murder)] and for Type B murder [(felony murder)] and that

the definition is given. The [definitional instruction for aggravated battery] does include the knowingly without legal justification language."

The trial court reiterated that it wanted to see a proposed instruction from defense counsel before it ruled. The next day, defense counsel proposed the following additional instruction for aggravated battery:

"To sustain the charge of aggravated battery, the State must prove the following proposition[s]:

*First Proposition*: That the defendant knowingly caused great bodily harm to William Hayes;

*Second Proposition*: That the defendant was not justified in using force which he used."

The instruction was a modification of IPI Criminal 4th No. 11.14, the issues instruction for aggravated battery. Defense counsel modified the pattern instruction by eliminating the final two paragraphs, which instruct that the State must prove all propositions beyond a reasonable doubt in order for the jury to find the defendant guilty of the offense (although, as noted, the modified instruction still referred to a "charge" of aggravated battery).

¶ 104    The trial court declined without explanation to give defendant's modified instruction. The result was that, for the charged offense of attempted murder, both the definitional and issues instructions were given, but for the uncharged offense of aggravated battery, only the definitional instruction was given.

¶ 105    The trial court also gave the following "escape" instruction based on IPI Criminal 4th No. 24-25.10 ("Forcible Felon Not Entitled To Use Force"):

"A person is not justified in the use of force if he is escaping after the commission of attempt first degree murder or aggravated battery."

¶ 106    During their deliberations, the jury sent the trial court a note asking if there was a separate charge of aggravated battery. The court replied that there was no such separate charge.

¶ 107    The jury found defendant guilty of first degree murder—both felony murder (counts VI and VII) and murder with intent or knowledge (counts I through V)—and of unlawful use of a weapon (count XIV). The jury found defendant not guilty of both the attempted murder of Hayes (count VIII) and the attempted murder of Castaneda (count IX).

¶ 108    Defendant filed a motion for a new trial, arguing in part that the trial court erred by failing to provide the jury defendant's modified issues instruction for aggravated battery. The court rejected the contention, noting that it would have been "contrary to the IPI" to provide the issues instruction for aggravated battery.

¶ 109    At sentencing, the court merged all counts but count XIV (unlawful use of a weapon) into count V (first degree murder—knowledge of strong probability of great bodily harm (720 ILCS 5/9-1(a)(2) (West 2012))). The court imposed consecutive sentences of 40 years' imprisonment on count V and 3 years' imprisonment on count XIV. After his motion to reconsider the sentence was denied, defendant timely appealed. He challenges both murder convictions but not the conviction of unlawful use of a weapon.

¶ 110                                    II. ANALYSIS

¶ 111                                   A. Jurisdiction

¶ 112        Defendant devotes a significant portion of his argument on appeal to the convictions on the felony-murder counts, counts VI and VII. The State, citing *People v. Cabellero*, 102 Ill. 2d 23 (1984), and other cases, maintains that we have no jurisdiction over counts VI and VII because the trial court did not impose sentence on them but merged them into count V (knowing murder).

¶ 113        We agree that we lack jurisdiction over counts VI and VII. In *Caballero*, the supreme court held that it had no jurisdiction to consider the defendant's contention that his armed-violence convictions were improper because of a variance between the information and the jury instructions. The court noted that, although the defendant was convicted of multiple offenses, including armed violence, he was sentenced only on his murder convictions and therefore the court had jurisdiction over only those convictions. *Id.* at 51; see also *People v. Neeley*, 2013 IL App (1st) 120043, ¶¶ 6, 15 (the court had no jurisdiction over the defendant's conviction of aggravated unlawful use of a weapon where it was merged into another conviction (unlawful use of a weapon by a felon) and no sentence was imposed on it). Under *Caballero*, our jurisdiction extends only to counts V and XIV, the counts on which the court imposed sentence.

¶ 114        In response to the State's reliance on *Caballero*, defendant cites two earlier supreme court decisions, *People v. Dixon*, 91 Ill. 2d 346 (1982), and *People v. Scott*, 69 Ill. 2d 85 (1977), and one appellate court decision, *People v. Baldwin*, 256 Ill. App. 3d 536 (1994). These cases affirm the authority of a reviewing court to remand for imposition of sentence on an unsentenced conviction. *Dixon*, 91 Ill. 2d at 354; *Scott*, 69 Ill. 2d at 88; *Baldwin*, 256 Ill. App. 3d at 545. To the extent that *Dixon* and *Scott* can be read to suggest that a reviewing court has jurisdiction to review the merits of an unsentenced conviction, we follow the supreme court's later decision in *Caballero*. We also, of course, follow *Caballero* over any contrary pronouncements by the appellate court in *Baldwin*.

¶ 115        Moreover, regardless of what authority this court has with respect to unsentenced convictions, we have no jurisdiction to review convictions that defendant has not in fact appealed. Under our duty to independently verify that we have jurisdiction (*People v. Smith*, 228 Ill. 2d 95, 104 (2008)), we determine that defendant's notice of appeal encompasses the convictions on only counts V and XIV. "[A] notice of appeal confers jurisdiction on a court of review to consider only the judgments or parts thereof specified in the notice of appeal." *Id.* Defendant's notice of appeal is on a preprinted form. In the blank for "Offense of which convicted," the notice states: "Murder—1st Degree Counts 5 and 14 (See Attached)." Attached to the notice is the sentencing order, which reflects that all counts other than count XIV were merged into count V. In the blank for "If appeal is not from a conviction, nature of order appealed from," the notice states, "Denial of Defendant's Motion to Reconsider Sentence." Although a notice of appeal is to be construed liberally (*id.*), we would have to rewrite the notice in this case to find jurisdiction beyond counts V and XIV. See *People v. Ware*, 2014 IL App (1st) 120485, ¶ 34 (no jurisdiction to review unspecified convictions); *People v. Smith*, 402 Ill. App. 3d 538, 541 (2010) (same). Consequently, we restrict our review to defendant's contentions that pertain to the convictions on counts V and XIV.

¶ 116                    B. Contentions Pertaining to Felony Murder Alone

¶ 117    The following contentions raised by defendant relate strictly to his convictions of felony murder on counts VI and VII: (1) there was insufficient evidence to support the convictions on counts VI and VII, (2) the jury instructions on felony murder (patterned on IPI Criminal 4th Nos. 7.01 and 7.02) improperly omitted the State's burden to prove that defendant did not act in self-defense, and (3) the concept of felony murder under Illinois law has fundamental flaws that were manifested in this case. We have no jurisdiction to consider these contentions.

¶ 118                                C. Jury Instructions

¶ 119    Defendant claims that the trial court erred in its determination of which jury instructions to give. The trial court's decision to give or refuse a jury instruction is generally reviewed for an abuse of discretion. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007). When the question is whether the instructions adequately conveyed to the jury the law applicable to the case, our review is *de novo*. *Id.*

¶ 120                       1. Instructions on Aggravated Battery

¶ 121    Defendant challenges the adequacy of the jury instructions on aggravated battery. The State asserts that we cannot address his arguments because they pertain solely to the felony-murder convictions over which (as we agree with the State) we lack jurisdiction.

¶ 122    We disagree that the arguments are restricted to the felony-murder convictions. Defendant does devote a significant portion of his arguments to the issue of how the jury should have been instructed on aggravated battery as a predicate offense for felony murder. However, he also discusses how the jury should have been instructed on aggravated battery as it related to the charge of knowing murder by virtue of the escape instruction, which stated: "A person is not justified in the use of force if he is escaping after the commission of attempt first degree murder or aggravated battery." As defendant notes, the jury must have found that he committed aggravated battery against Hayes, since the jury found defendant guilty of the felony murder of Wild but not guilty of the only other predicate offense, the attempted murder of Hayes. Significant here, the jury may also have determined that defendant stabbed Wild while escaping after the commission of the aggravated battery and, therefore, was barred from claiming self-defense as to the knowing-murder charge. Of course, the jury could have determined that defendant was *not* escaping after the aggravated battery and still have rejected defendant's claim of self-defense as it pertained to the knowing-murder charge. Given, however, the possibility that the aggravated battery underlay defendant's conviction of the knowing murder of Wild, we proceed to address defendant's arguments concerning the jury instructions for aggravated battery.

¶ 123    Defendant claims that the trial court erred by failing to give the jury his proposed issues instruction for aggravated battery, which was a modification of IPI Criminal 4th No. 11.14. For support, defendant cites the committee notes to IPI Criminal 4th No. 11.13, the definitional instruction for aggravated battery. The committee states there that, where the trial court gives IPI Criminal 4th No. 11.13, it should also give the issues instruction for aggravated battery, IPI Criminal 4th No. 11.14. See IPI Criminal 4th No. 11.13, Committee Note ("Give Instruction 11.14."). As the parties and the trial court recognized below, however, the pattern issues instruction by its terms refers to a "charge" of aggravated battery

and provides the conditions under which a jury may find the defendant guilty of the offense. Fortunately, there is specific direction from the committee regarding the instructions appropriate for *uncharged* offenses. It comes from the user's guide to IPI Criminal 4th. There, the committee states:

> "Both the definition and issues instructions should be given for the offense charged. However, on occasions when an issues instruction refers to an offense which is not charged, only the definitional instruction should be given." IPI Criminal 4th, User's Guide, at viii.

"While committee comments are not the law, the trial court is allowed to deviate from the suggested instructions and format only where necessary to conform to unusual facts or new law ***." *People v. Banks*, 287 Ill. App. 3d 273, 280 (1997). Defendant does not acknowledge the foregoing comment from the user's guide, and none of the cases he cites convince us that the comment is out of step with Illinois law. Defendant relies on *People v. Thurman*, 104 Ill. 2d 326 (1984), and *People v. Getter*, 2015 IL App (1st) 121307, both of which are readily distinguishable.

¶ 124    In both *Thurman* and *Getter*, the defendant was charged with multiple offenses and claimed self-defense with respect to each offense. In each case, the issues instructions for all but one of the offenses stated that the prosecution was required to prove that the defendant did not act in self-defense. The reviewing court reversed the defendant's conviction of that one offense. The court in *Thurman* found it insufficient that the phrase "without lawful justification" appeared in the definitional instruction for the offense, "for unless similar language appears in the issues instruction for that offense[,] a prudent juror could easily conclude that the absence of self-defense need not be found before returning a guilty verdict." *Thurman*, 104 Ill. 2d at 331. Similarly, the court in *Getter* remarked: "Where three of the four charged offenses included a self-defense instruction, but the remaining aggravated discharge instruction did not, a rational juror employing elementary rules of logic could—in fact, should—find that omission to be meaningful." *Getter*, 2015 IL App (1st) 121307, ¶ 41. The *Getter* court held broadly:

> "[B]eyond giving a general definition of self-defense and a general instruction on the State's burden of proof, the trial court should include an issues instruction for each *applicable offense* that the State bears the burden of proving, beyond a reasonable doubt, that defendant lacked justification in using the force he used." (Emphasis added.) *Id.* ¶ 40 (citing *People v. Bigham*, 226 Ill. App. 3d 1041, 1046 (1992)).

The court did not define "applicable offense," but we take direction from the language in *Bigham* on which the *Getter* court relied:

> "The preferred method of instructing the jury about self-defense is to give the definitional instruction of self-defense [citation] following the definition of the crime with which the defendant *is charged* and to modify the issues instruction for each offense to which the defense applies by including as a proposition that the State has the burden of proving the defendant was not justified in using the force he used [citation]." (Emphasis added.) *Bigham*, 226 Ill. App. 3d at 1046.

*Bigham* was speaking of offenses that were charged, as indeed was the offense in that case. We find no suggestion in *Thurman*, *Getter*, or *Bigham* that their holdings were meant to apply to uncharged offenses.

¶ 125    Thus, defendant has not convinced us that the law as formulated in Illinois decisions requires deviation from the committee's guidance in the user's guide. Nor are we persuaded that there are "unusual facts" (*Banks*, 287 Ill. App. 3d at 280) here warranting such a departure. Defendant claims that the jury likely was confused as to the uncharged offense of aggravated battery. He maintains that the definitional instruction for aggravated battery was inadequate on two scores. First, he notes that the instructions for attempted murder (Hayes) and knowing murder (Wild), included issues instructions specifying that the State had to prove that defendant's use of force was unjustified. (There was no such proposition in the issues instruction for felony murder because if self-defense were disproved with respect to one of the underlying offenses, and the killing occurred during the commission of that offense, then self-defense would not apply to the killing itself (see *People v. Moore*, 95 Ill. 2d 404, 411 (1983); see also 720 ILCS 5/7-4(a) (West 2012) (self-defense cannot be claimed by a person who "[i]s attempting to commit, committing, or escaping after the commission of, a forcible felony")).) In contrast, he observes, the definitional instruction for aggravated battery contained the more general "without legal justification" language.

¶ 126    Second, he points out that the definitional instruction for aggravated battery did not state that the prosecution was required to prove the elements of aggravated battery beyond a reasonable doubt. Defendant maintains that the foregoing circumstances, combined with the trial court's confirmation to the jury that there was no separate charge of aggravated battery, led the jury to conclude "that the offense of aggravated battery had already been sustained and the State was required to prove nothing further." He maintains that, at a minimum, "a logical jury would have assumed self-defense was not a defense to the offense of aggravated battery as to Hayes."

¶ 127    "The function of jury instructions is to convey to the jury the law that applies to the evidence presented." *People v. Herron*, 215 Ill. 2d 167, 187 (2005). "Jury instructions should not be misleading or confusing [citation], but their correctness depends upon not whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them [citation]." *Id.* at 187-88. Jury instructions are adequate if, taken as a whole, they fairly, fully, and comprehensively apprised the jury of the relevant legal principles. *People v. Parker*, 223 Ill. 2d 494, 501 (2006). The closing arguments of the parties are also instrumental in forming a jury's understanding of the law and can compensate for confusing aspects of the instructions. See *People v. Basden*, 264 Ill. App. 3d 530, 545 (1994).

¶ 128    Applying these criteria, we find no merit to defendant's concerns that the jury misunderstood the elements of aggravated battery and the State's burden of proof on those elements. First, as to the elements of aggravated battery, the jury received not only the definitional instruction for the offense, which contained the "without legal justification" language, but also IPI Criminal 4th No. 24-25.06. The latter, as given to the jury, read:

> "A person is justified in the use of force when and to the extent that he reasonably believes such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes such force is necessary to prevent imminent death or great bodily harm to himself."

In closing argument, the State linked IPI Criminal 4th No. 24-25.06 with the definitional instruction for aggravated battery. The State said:

> "I will go over aggravated battery \*\*\*, the definition. A person commits the offense of aggravated battery when he knowingly, without legal justification, and by any means causes great bodily harm to another person. So then you are going to get a definition of legal justification, what is self defense.
>
> Well, the legal definition is a person is justified in the use of force when, to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force. However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself. \*\*\*
>
> \* \* \*
>
> Aggravated battery, the definition for aggravated battery was that he knowingly and without lawful justification caused great bodily harm. Let's break that down.
>
> Great bodily harm. Great bodily harm is exactly what Willie Hayes endured because of the defendant's attack. \*\*\*
>
> But you also have to inquire and deliberate as to whether or not this is self defense. Clearly, this is not a case of self defense. And some key words here that you should be aware of. I will direct your attention to the second paragraph in the self defense instruction.
>
> It says, however, a person is justified in the use of force which is intended or likely to cause death or great bodily harm—a knife attack—only if he reasonably believes such force is necessary to prevent imminent death or imminent great bodily harm. Reasonably believes."

These comments adequately clarified for the jury that the State, in order to prove that the stabbing of Hayes was without legal justification, had to establish specifically that defendant's use of force was not justified under the circumstances. The State's closing argument left no room for a reasonable jury to believe that the State did not have to establish the same self-defense propositions with respect to aggravated battery as it did with respect to attempted murder and knowing murder.

¶ 129    Second, the jury would also have properly understood that the State had to prove the self-defense propositions beyond a reasonable doubt with respect to the aggravated battery, just as with the attempted murder and knowing murder. The source for that understanding was the issues instruction for felony murder, which we consider notwithstanding our lack of jurisdiction to review the felony-murder conviction itself. See *Parker*, 223 Ill. 2d at 501 (reviewing court considers the jury instructions as a whole). That instruction informed the jury that, in order to find defendant guilty of felony murder, it had to find beyond a reasonable doubt that defendant committed attempted murder or aggravated battery. As noted, the jury would have understood that one of the propositions that the State had to prove in order to establish either predicate offense was that defendant's use of force was not justified. A straightforward inference would have been that the State had to prove that proposition beyond a reasonable doubt.

¶ 130    As for the question from the jury, it hardly need be construed as a sign of confusion over the State's responsibility as to the uncharged offense of aggravated battery. The jury might simply have been asking whether a verdict was necessary for that offense.

¶ 131    For these reasons, we find no risk of juror confusion from the trial court's decision not to instruct the jury per defendant's proposed issues instruction for aggravated battery.

¶ 132                    2. Escape Instruction

¶ 133    Defendant claims that the trial court erred by submitting IPI Criminal 4th No. 24-25.10, the escape instruction. According to the State, defendant has forfeited this contention. The State points out that, at a pretrial jury-instruction conference, defense counsel stated that he had no objection to the escape instruction. Ignoring this fact, defendant points to the jury-instruction conference that immediately preceded the parties' closing arguments. During that conference, defense counsel had this exchange with the trial court:

"THE COURT: *** [State's instruction No.] 27 is [IPI Criminal 4th No. 24-25.10]. Are you objecting?

MR. KENDALL [defense attorney]: Judge, I believe we originally did to some of these. And these were—

THE COURT: It's given over objection."

Before defense counsel could clarify whether he indeed was objecting, the trial court interjected and deemed counsel as having objected. Counsel said nothing further on the instruction. "The rule in Illinois is that objections to instructions offered by an opposing party must be made at the time of the instructions conference and must be specific, otherwise they are forfeited on appeal." *People v. Watt*, 2013 IL App (2d) 120183, ¶ 33. Counsel did not clarify that he was actually objecting, much less specify the grounds for an objection. Thus, defendant has forfeited his challenge to the escape instruction. Although the plain-error doctrine allows us to reach unpreserved claims of error in certain circumstances (*People v. Gumila*, 2012 IL App (2d) 110761, ¶ 36), the burden is on the defendant to establish plain error, and, consequently, he forfeits such review when he does not argue for it (see *People v. Hillier*, 237 Ill. 2d 539, 545 (2010) ("A defendant who fails to argue for plain-error review obviously cannot meet his burden of persuasion.")). Defendant does not argue for plain-error review of this issue; hence, the forfeiture stands and we do not address the contention. See *People v. Naylor*, 229 Ill. 2d 584, 593 (2008) ("When a defendant fails to establish plain error, the result is that the 'procedural default must be honored.' " (quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995))).

¶ 134                    D. Questioning of Fasana

¶ 135    Defendant contends that the trial court erred in denying his motion for a mistrial following the State's series of questions to Fasana about whether, at any time during his contact with defendant, defendant queried him about the condition of Wild, Castaneda, or anyone else. *Supra* ¶ 53. According to defendant, the questions violated his constitutional right to remain silent as expounded in *Doyle v. Ohio*, 426 U.S. 610, 619 (1976) (it is improper for the State to use the defendant's postarrest silence in order to impeach the defendant or otherwise create an inference of guilt).

¶ 136     We address first the State's claim that defendant failed to preserve this issue for appeal. The State notes that defendant did not object before Fasana answered the questions at issue, except to the question concerning Wild, to which defendant objected on a different ground (namely, foundation) than what he raises on appeal. To preserve for appeal an issue regarding the propriety of the State's evidence, the defendant must make a contemporaneous objection to the evidence. *People v. Romero*, 387 Ill. App. 3d 954, 970 (2008). Here, although defendant did not object on *Doyle* grounds before the questions were answered, he called for a sidebar conference immediately after Fasana answered the last in the series of questions now challenged. In that sidebar conference, defendant raised his *Doyle* objection. We hold that defendant's *Doyle* objection was timely and reject the State's claim of forfeiture. See *People v. Begay*, 377 Ill. App. 3d 417, 421 (2007) (defense objection to other-acts evidence consisting of the defendant's "egging" of two cars was timely where defense counsel did not object when the victim testified that her car was egged but objected "moments later" when the victim's friend testified that her car was egged as well).

¶ 137     On the merits, the State suggests that Fasana's answers "could be construed as concerning defendant's *pre*-arrest silence" (emphasis added) because Fasana was asked whether defendant made the queries "at any point" during Fasana's contact with him. A rational jury, however, would have understood the phrase "at any point" as also covering defendant's *post*arrest silence, and that is what brings the line of questioning under constitutional scrutiny.

¶ 138     We agree with defendant that the questions asked of Fasana were improper under *Doyle* because they pertained to defendant's postarrest silence and were designed to invite an inference of guilt. *Doyle* violations, however, are subject to a harmless-error analysis. *People v. Hart*, 214 Ill. 2d 490, 517 (2005). The following five context-dependent factors are applied in determining whether a *Doyle* violation constitutes harmless error: "(1) the party who elicited the testimony about defendant's silence; (2) the intensity and frequency of the references to the defendant's silence; (3) the use that the prosecution made of defendant's silence; (4) the trial court's opportunity to grant a mistrial motion or to give a curative jury instruction; and (5) the quantum of other evidence proving the defendant's guilt." *Id.* at 517-18.

¶ 139     Applying these factors, we find that the error was harmless. The questions were at best an oblique pass at defendant's frame of mind during the stabbings. The State was inviting this chain of inference: defendant failed to inquire after the welfare of those hurt because he was indifferent or callous, and because he was indifferent or callous at *that* time, he could not have acted in self-defense several minutes before. Even if the jury was tempted to accept this rather tenuous inference, the immediate objection by defense counsel and the quick resolution by the trial court left the State no further occasion to address defendant's silence. The trial court offered defendant a choice of two ways forward: leave the matter unaddressed and draw no further attention to it, or give a cautionary instruction. Defendant opted for the latter. Defendant is correct that cautionary instructions do not always cure *Doyle* violations (see *United States v. Curtis*, 644 F.2d 263, 270-71 (3d Cir. 1981)), but in this case the error was neutralized by the instruction and other relevant factors. The final factor we consider is the evidence of defendant's guilt apart from the questions that violated *Doyle*. That independent evidence abundantly supported defendant's convictions, as we discuss below

(*infra ¶¶* 140-176).

¶ 140                                E. Sufficiency of the Evidence

¶ 141      Defendant challenges the sufficiency of the evidence to support his conviction of the knowing murder of Wild. He also challenges the jury's (implied) finding that he committed aggravated battery against Hayes. The aggravated battery finding is relevant to the conviction of the knowing murder of Wild because, as applied to this case, the escape instruction (IPI Criminal 4th No. 24-25.10) would bar defendant from claiming self-defense as to the murder of Wild if defendant committed that offense while fleeing following the aggravated battery of Hayes.

¶ 142      "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48. It is the function of the jury as the trier of fact to assess the credibility of the witnesses and the weight to be given their testimony, to resolve conflicts or inconsistencies in the evidence, and to draw reasonable inferences from the evidence. *People v. Lee*, 213 Ill. 2d 218, 225 (2004). On these matters, the reviewing court will not substitute its judgment for that of the trier of fact. *Brown*, 2013 IL 114196, ¶ 48. "[A] criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 143      Defendant raised self-defense with respect to both aggravated battery and knowing murder. "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *Lee*, 213 Ill. 2d at 224. Defendant does not dispute the elements of either offense but focuses his challenge on the issue of self-defense.

¶ 144      "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2012). Thus, the elements of a self-defense claim are: "(1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Lee*, 213 Ill. 2d at 225; see also 720 ILCS 5/7-1(a) (West 2012).

¶ 145      "However, [a person] is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2012). Of the forcible felonies listed in section 2-8 of the Criminal Code of 2012 (720 ILCS 5/2-8 (West 2012)), the only applicable one under these facts is aggravated battery (great bodily harm) (720 ILCS 5/12-3.05(a)(1) (West 2012)). If the State negates any one of the elements of self-defense, the claim fails. *Lee*, 213 Ill. 2d at 225.

¶ 146       In assessing a self-defense claim, the jury considers "the probability or improbability of the defendant's account, the circumstances surrounding the crime, and the relevant testimony of other witnesses." (Internal quotation marks omitted.) *People v. Young*, 347 Ill. App. 3d 909, 920 (2004).

¶ 147       In order to show that the error in the questioning of Fasana was harmless (*supra* ¶ 139), we exclude that evidence in our discussion.

¶ 148                               1. Aggravated Battery of Hayes

¶ 149       We begin with the finding of aggravated battery. The State suggests that, for both the aggravated-battery finding and knowing-murder conviction, we need not look beyond the State's evidence of the jail phone calls that defendant had with his father and his brother-in-law in late 2014 and early 2015. According to the State, the phone calls were sufficient in themselves for rejecting defendant's self-defense claim, for they exposed the claim as a fabrication. Defendant responds that his claim of self-defense at trial was essentially the same as the account he gave police on February 4, 2012. Defendant is correct; the main points of defendant's account at trial are seen in his February 4 statement to police, with additional detail provided in his testimony. The State's claim of fabrication assumes that, after his statement to police, defendant lost his independent memory of the night's events. Defendant told his father during the phone calls that he had almost no recollection of the night at Frankie's, but he testified at trial that he had not been truthful to his father on that point. We do not know what the jury concluded from the phone calls, but as we explain below, the jury could have reasonably rejected the self-defense claim without finding from the phone calls that defendant fabricated the claim.

¶ 150       Defendant claims that the "resolution of this case begins" with defendant's quarrel with Gargaro, for it "provided the motivation for Tassio to escort Hayes to booth No. 4 to confront Defendant, who was minding his own business." Defendant submits that the prior events of that evening, including defendant's interaction with Schwenn, Jepson, and Reynolds, are "barely relevant" to the issues on appeal.

¶ 151       We see it otherwise, but before we elaborate, we address defendant's challenge to the State's proof that defendant displayed a knife to Reynolds. First, defendant claims that the knife is not visible on the security video. We agree, but this is not conclusive. The footage is grainy and the palm of defendant's right hand appears angled away from the camera. The footage is consistent with Reynolds's account in that defendant's right arm is positioned across his body as Reynolds claimed it was when defendant showed the knife.

¶ 152       Second, defendant relies on an inconsistency between Reynolds's and Kruse's testimony. Specifically, Reynolds testified that he told Kruse that defendant displayed a knife, while Kruse testified that Reynolds said only that defendant threatened to stab Reynolds. This is not a significant discrepancy given the passage of time between the incident (February 2012) and trial (March 2015).

¶ 153       Third, defendant observes that neither Reynolds nor Kruse reported defendant to Frankie's personnel. But both witnesses explained that they thought at the time that the threat was swagger and not substantial. Reynolds testified that he was shocked when defendant showed the knife but that he did not believe at the time that defendant would actually stab someone. Reynolds testified that, in retrospect, he wished that he had reported defendant.

¶ 154    Finally, defendant notes that Reynolds is seen with a "giant smile" shortly after, Reynolds claimed, defendant displayed the knife. According to defendant, "that smile establishes that the event did not occur." This is an overreach. Reynolds is indeed smiling, but it hardly follows that he was not threatened shortly beforehand. He could have quickly become distracted by his companions at Frankie's.

¶ 155    Defendant questions the pertinence of the events involving Schwenn, Jepson, and Reynolds. He says: "The State's theory was that Defendant decided to stab a person, Hayes, that he had not met yet, after another person, Reynolds, danced with a girl, Schwenn, that defendant had met that night." Defendant is correct to this extent: the State set out to prove that defendant was in a certain frame of mind (aggressive, volatile, willing to use a knife as a threat or worse) when he encountered Hayes. Defendant is inconsistent, however: he diminishes the materiality of the State's endeavor while insisting that it was material that *Hayes* was in a certain frame of mind (wanting to confront defendant for some offense(s)) before sitting down in booth No. 4.

¶ 156    Defendant also caricatures what the State aimed to prove with the events involving Schwenn, Jepson, and Reynolds. The State's aim was not to show that defendant was already intent on stabbing someone when he encountered Hayes in booth No. 4. The State's purpose, rather, was to show that defendant was, at best, willing to ward off a romantic rival by displaying a knife and, at worst, willing to use that knife on a romantic rival who did not desist. The jury could have reasonably determined from the night's fatal outcome that defendant was indeed signaling to Reynolds a willingness to use force to overcome obstacles.

¶ 157    Defendant suggests that, if the State's theory were "logical," then defendant "would have fought or argued with Reynolds" rather than make "some indecipherable threat against unknown events to take place in the future against some third party." Reynolds took defendant's words ("I have it covered, or, it will be taken care of") as a threat directed at him, not some third party. There is no other sensible reading since Reynolds was the one who danced with Schwenn, the one whom defendant approached, and the one who apologized to defendant in the event that Schwenn was his girlfriend. Defendant took no further action against Reynolds, but a reasonable explanation is that defendant did not consider him enough of a threat at the time.

¶ 158    Defendant's romantic interest in Schwenn, we note, contextualized his behavior toward Reynolds. Defendant doggedly pursued Schwenn for most of her time at Frankie's. The security video shows him "cutting in" on Schwenn and Reynolds and placing his hands on Schwenn's buttocks as they dance. Eventually, Schwenn told defendant that she was not interested, and Jepson confirmed Schwenn's lack of interest when Jepson and defendant later spoke in booth No. 4. Although a relatively minor detail, defendant's subsequent uncooperative attitude toward Schwenn and Jepson could reasonably be seen as a facet of a darkening mood.

¶ 159    Significantly, while defendant claims that his argument with Gargaro was important for showing Hayes's motive in coming to booth No. 4, that incident was potentially damaging for the defense as well. According to Gargaro, defendant inexplicably instigated a quarrel by verbally abusing her. Defendant acknowledged at trial that he "argued" with Gargaro and called her a "fucking bitch," but he claimed that she yelled at him first. Thrun and Bulandr observed the quarrel after it had started and did not testify as to the instigator. The security video depicts who initiated contact (defendant) but not who instigated the actual quarrel. The

video does show defendant persist in engaging with Gargaro even after she turns and attempts to withdraw. It was the jury's prerogative to resolve the conflict in the testimony and find that defendant verbally attacked Gargaro without provocation—a further sign of a hostile mood that, combined with the incident involving Reynolds, did not bode well.

¶ 160    In sum, a rational jury could infer from the events preceding defendant's encounter with Hayes in booth No. 4 that defendant was growing belligerent and was willing to "take care" of matters with his knife.

¶ 161    Most crucial, of course, to the aggravated battery finding are the six minutes (12:40 to 12:46 a.m.) immediately preceding the stabbing of Hayes, in which he and defendant are seated in booth No. 4. Defendant, Hayes, Crackel, and Sartori gave accounts, with varying degrees of detail, of defendant's interaction with Hayes. All agreed that there was tension or even hostility between defendant and Hayes. Defendant claims that he stabbed Hayes out of a reasonable fear of imminent bodily harm because (1) Hayes, a large man ("huge," according to defendant), stood up and threatened to, as defendant testified, "beat the fucking shit" out of him and "fuck [him] up," (2) after defendant asked some of Hayes's associates for help, they calmed him down at first, but he threw off Wild's arm and, as defendant testified, "lunged" at defendant, and (3) from the time that Hayes made his first threat, defendant was "surrounded" by Hayes's associates; specifically, Sartori blocked his exit from the booth, and Tassio stiff-armed him when he tried to stand.

¶ 162    As noted, the use of deadly force is justified on self-defense grounds where (1) the defendant *subjectively believed* that the use of such force was necessary to prevent death or great bodily harm and (2) the defendant's belief was *objectively reasonable*. 720 ILCS 5/7-1(a), (b) (West 2012). A rational jury could have found that the State disproved both elements here beyond a reasonable doubt. Only defendant testified that Hayes threatened him with bodily harm and made an aggressive movement toward him. Sartori heard only defendant and Hayes raise their voices to each other and Hayes's comment that defendant was drinking beer out of a wine glass. Sartori could not recall seeing any aggressive gesture by Hayes. Crackel also testified that defendant and Hayes spoke in raised voices, and Crackel heard the two exchange insults. Crackel testified that he and Wild attempted to "mediate" the situation (Crackel admitted telling the police that he and Wild were trying to calm Hayes down). Defendant did not ask for help in controlling Hayes; he appeared to Crackel calm and confident but angry. Crackel did not testify to any aggressive movement by Hayes.

¶ 163    Hayes testified that he was intoxicated that night and could not recall threatening defendant or lunging at him. Hayes claimed that such conduct would have been inconsistent with his character. According to Hayes, defendant was the aggressive party, and he made Hayes uncomfortable and want to leave. Hayes admitted that the security video showed that he had opportunities to leave before the stabbing. Hayes also admitted, based on the video, that he threw off Wild's arm to "get back at the defendant." Hayes could not recall his statements to the police, but Arsenault testified that Hayes told him on February 6, 2012, that Hayes went to booth No. 4 because a friend reported to him that defendant said that Hayes's shirt was too tight.

¶ 164    The security footage is revealing. Defendant's demeanor during his interaction with Hayes is not that of a man in fear. He gestures dramatically with his arms. He leans toward Hayes, pointing several times to his own chest. Hayes seemingly remains composed, his arms folded on the table. At one point, defendant stands and, continuing to gesture, leans over the

table at Hayes, who remains seated. The footage is consistent with defendant's testimony that he argued back at Hayes and had a shouting match with him; defendant evidently was not shrinking under the tension.

¶ 165    Defendant testified, however, that he became frightened when he tried to stand but Tassio stiff-armed him back into his seat. Tassio did not testify, but the security footage rebuts defendant's claim that Tassio stiff-armed him. Defendant is not attempting to stand at that point in the video (12:44:16 a.m.); he is raising his right hand to Tassio as if to invite a high five or a fist bump. Tassio appears to reciprocate.

¶ 166    Defendant continues not to act in a fearful manner even when, at 12:45:15 a.m., Hayes stands, leans over with his hands on the table, and according to defendant, threatens to "beat the shit out of" him. At this point, defendant gets the attention of Crackel and Wild, but he remains seated, his wine glass held in his left hand at chest level. Defendant testified that, when Hayes issued another threat to "fuck that asshole up," he told Hayes "fuck you" in response. Thus, by his own admission, defendant continued to defy Hayes, not cower. In the footage, even during Wild's initial attempts to hold Hayes back or escort him away, defendant still sits and holds his drink at chest level. By all appearances he is, as Crackel described him, "calm," even relaxed. His posture is not that of a man in fear of a "huge" antagonist. Defendant does not change his posture until Hayes throws off Wild's arm and leans over again with his hands on the table. Defendant then stands but does not lash out immediately at Hayes as might be expected of one in true fear of imminent harm. Rather, defendant calmly takes a drink with his left hand before stabbing Hayes in the chest with his right hand.

¶ 167    Defendant's failure to make any attempt to extricate himself from the situation also suggests that he did not subjectively believe that Hayes posed an imminent threat. The record does not bear out defendant's suggestion that he was unable to leave because Hayes's associates were "surrounding" the booth. As noted, Tassio cannot reasonably be seen as forcing defendant back into his seat. Neither is an "enforcement" role reasonably ascribed to Hayes's other associates—Sartori, Crackel, Wild, Thrun, and Bulandr—who were in the vicinity of booth No. 4. As for Sartori, the footage shows him standing by booth No. 4 for a time, but he is mostly facing the dance floor and appears uninterested in what is happening in booth No. 4. Moreover, at 12:45:16 a.m. he vacates his "guard post" and sits in booth No. 3. Sartori looks over at booth No. 4 while defendant and Hayes are conversing, but he stands again only after defendant stabs Hayes.

¶ 168    Crackel and Wild were standing near booth No. 4, but defendant actually credits them for attempting to calm Hayes. Bulandr and Thrun were also in the vicinity of the booth, but defendant specifies no reason why he would believe that they were a threat. Defendant in fact testified that he became friendly with the man—Thrun, based on defendant's testimony and the security footage—who stepped between defendant and Gargaro during their argument. Also, Thrun did not testify that he was even aware at the time that defendant and Hayes were conversing in booth No. 4. Bulandr testified to an awareness of the conversation but not to any interest in it. The security footage likewise does not suggest how defendant could have reasonably viewed Thrun or Bulandr as an intimidating presence.

¶ 169    Even if defendant subjectively believed that Hayes threatened imminent death or great bodily harm, the belief was not objectively reasonable. The security footage contradicts defendant's assertion that Hayes "lunged" at him. When Hayes throws off Wild's arm and

moves back toward defendant, he does not go around the table and approach defendant directly. Rather, he leans over the table, resting his hands on it, as he had done before. Between defendant and Hayes is not only the table but also Wild, who has persisted in trying to calm Hayes and remove him from the situation and who now has his shoulder against Hayes and his arm across Hayes's body. With his hands on the table and two obstacles between him and defendant, Hayes posed no threat of imminent death or great bodily harm. Defendant could have left the booth and/or displayed his knife as a warning. These were realistic options short of stabbing Hayes in a vital area.

¶ 170    In sum, a rational jury could have found beyond a reasonable doubt that defendant was not justified in using deadly force against Hayes by stabbing him in the chest.

¶ 171                              2. Knowing Murder of Wild

¶ 172    Defendant contends that the State failed to prove beyond a reasonable doubt that he did not act in self-defense in stabbing Wild. Defendant cites the testimony of the several witnesses who observed the physical struggle between Wild and defendant after the stabbing of Hayes. We need not examine that testimony because the jury could have rejected defendant's self-defense claim without even applying the elements. Specifically, the jury could have found that defendant stabbed Hayes without legal justification and, while escaping after that offense, was confronted by and stabbed Wild.

¶ 173    The jury was instructed that "[a] person is not justified in the use of force if he is escaping after the commission of attempt first degree murder or aggravated battery." See IPI Criminal 4th No. 24-25.10; see also 720 ILCS 5/7-4(a) (West 2012) (self-defense cannot be claimed by a person who "[i]s attempting to commit, committing, or escaping after the commission of, a forcible felony").

¶ 174    Notably, in his argument on the sufficiency of the evidence to support the finding of aggravated battery and the conviction of knowing murder, defendant does not address the possibility that the jury found defendant barred from claiming self-defense based on the escape instruction. There are, however, comments elsewhere in his brief that touch on whether defendant stabbed Wild while escaping. In his argument that the evidence did not support an escape instruction (which we found forfeited, *supra ¶¶* 132-133), defendant says:

> "Defendant's conduct in leaving the group to avoid further confrontation cannot reasonably be inferred to constitute an 'escape.'
>
> While the State disputes Defendant's intent at the time of the stabbing of Hayes and the incident with Wild, there is little dispute of Defendant's conduct immediately after the stabbing of Hayes. Defendant closed the knife after he stabbed Hayes. [Citation.] Defendant then walked slowly away from Hayes and his group. The State repeatedly acknowledged that defendant closed the knife at that time. [Citation.] No evidence suggested Defendant ran for the exit after he stabbed Hayes."

The security footage shows defendant walking north, along the row of booths, before disappearing into the crowd. Defendant does not cite the record in claiming that he walked "slowly." His pace cannot be determined from the choppy security footage. Whatever defendant's actual pace, the jury could have reasonably found that he was heading for the north entrance, which was west of the stage. Defendant acknowledged that he walked toward the stage after leaving booth No. 4. Doti witnessed defendant walking on the dance floor

toward the stage just before he turned and leaped at Wild. Other witnesses observed the struggle between Wild and defendant take place on the stage end of the dance floor.

¶ 175 Defendant emphasizes that he closed the knife after stabbing Hayes, but he fails to explain how that suggests he did not intend to escape. Closing the knife might have indicated an intent to disengage from the conflict, but that is not inconsistent with an intent to escape.

¶ 176 Accordingly, the jury could have reasonably found that defendant was escaping when Wild caught up with him and was stabbed. That finding would have required the jury to reject, without further analysis, defendant's claim of self-defense as to the stabbing of Wild. We affirm defendant's conviction of the knowing murder of Wild.

¶ 177                                      III. CONCLUSION

¶ 178 For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 179 Affirmed.